742 S.E.2d 394

**Brad Keith SIGMON, Petitioner,**

**v.**

**STATE of South Carolina, Respondent.**

Appellate Case No. 2009–136506.

No. 27233.

Supreme Court of South Carolina.

Submitted Oct. 15, 2012.

Refiled May 8, 2013.

Chief Appellate Defender Robert M. Dudek, of Columbia, and William H. Ehlies, II, of Greenville, for Petitioner.

Attorney General Alan M. Wilson, Chief Deputy Attorney General John W. McIntosh, Senior Assistant Deputy Attorney General Donald J. Zelenka, and Assistant Attorney General Melody Jane Brown, all of Columbia, for Respondent.

Justice HEARN.

A jury convicted Brad Keith Sigmon of two counts of murder and burglary in the first degree, and it subsequently sentenced him to death. His convictions and sentences were affirmed on direct appeal in *State v. Sigmon*, 366 S.C. 552, 623 S.E.2d 648 (2005). We granted certiorari to review the circuit court's dismissal of Sigmon's application for post-conviction relief (PCR) and now affirm.

## FACTUAL/PROCEDURAL BACKGROUND

Sigmon and Rebecca "Becky" Larke were in an intimate relationship for approximately three years. They were living together in her trailer when she informed Sigmon she did not want to see him anymore. Becky's parents, Gladys and David Larke, lived next door to them in a trailer on the same property. David also informed Sigmon that Becky wanted him to move out and served him with eviction papers, stating Sigmon had to leave within two weeks. Becky subsequently moved in with her parents. Sigmon believed she had begun a new relationship and although he pleaded with her to come back, she refused. Sigmon became increasingly obsessed with Becky, stalking her in an attempt to verify she was seeing another man.

About a week after Becky asked him to leave, Sigmon was drinking and smoking crack cocaine with his friend, Eugene Strube, in Becky's trailer. At some point in the evening, Sigmon decided he would go to the Larkes' home the following morning after Becky left to take her children to school and tie up Becky's parents. When Becky returned home, Sigmon intended to kidnap her and disappear with her, but he did not want her parents to be able to call the authorities. Sigmon and Strube eventually ran out of crack and Strube fell asleep.

In the morning, after they saw Becky leave, Strube and Sigmon exited the trailer. However, Strube changed his mind about helping Sigmon and left. Sigmon grabbed a baseball bat from beneath his trailer and entered the Larkes' trailer. Upon seeing Sigmon, David told his wife to bring him his gun, and Sigmon hit him in the back of the head several times with the bat. Sigmon then saw Gladys, ran after her into the living room, and hit her several times in the head. He returned to

the kitchen where David lay and hit him several more times with the bat because he was still moving. He then went back to Gladys, saw that she was still moving, and hit her several more times.

Sigmon retrieved David's gun and waited for Becky to return home. When Becky arrived, Sigmon brandished the gun, took her car keys, and forced her in her car. He intended to pick up his own car and drive to North Carolina with Becky. However, she managed to jump out of the car and tried to run away. Sigmon pulled over and chased after her, shooting her several times. When he realized he was out of bullets, he got back in her car and fled. Although Becky was injured, she survived the assault and told the witnesses who came to her aid that Sigmon told her he had either tied up or killed her parents. Police officers were dispatched to the Larkes' home where the bodies were discovered.

A manhunt ensued and Sigmon was eventually captured in Gatlinburg, Tennessee after he called his mother, who was assisting the police in locating him. He was arrested without incident and taken into custody by the Gatlinburg police department where he confessed to murdering the Larkes and kidnapping and shooting Becky. He admitted that he intended to kill Becky and then kill himself. Officers from Greenville arrived to transfer him back to Greenville, but, at Sigmon's request, they took his statement before leaving Tennessee. He again confessed to his crimes and stated his plan had been to kill Becky and himself.

Sigmon was indicted for two counts of murder; assault and battery with intent to kill; kidnapping and possession of a firearm during the commission of a violent crime; first degree burglary; and grand larceny. The case proceeded to trial only on the murder and first degree burglary charges. Sigmon conceded guilt and presented no evidence in his defense. The State presented expert testimony that both of the Larkes died as a result of blunt force trauma to the head, describing the severity of their wounds. Both sustained nine lacerations to the head, causing hemorrhaging and filling the sinuses with blood, so that they were breathing in blood as they died. It was estimated that both lived for three to five minutes before dying from their wounds. Additionally, both sustained defen-

sive wounds to their forearms. The jury ultimately found Sigmon guilty.

During the penalty phase, the defense presented testimony regarding Sigmon's mental state, such as his issues with childhood abandonment and neglect that affected the development of his social mores and overall judgment, as well as evidence of an extensive history of drug use stemming from his "recurrent major depressive disorder" or his "chemical dependency disorders." Sigmon additionally presented evidence that he was adapting to prison life and that he was not a problematic or difficult prisoner. Sigmon testified he was sorry for the crimes and admitted he probably deserved to die.

The court charged the jury to consider three factors in aggravation: that two or more persons were killed, that the murder was committed during the commission of a burglary, and that the murder was committed with physical torture. It also charged the jury to consider four statutory mitigating circumstances: that the defendant had no prior history of criminal convictions involving the use of violence against another person; the murder was committed while the defendant was under the influence of emotional or mental disturbance; the capacity of the defendant to appreciate the criminality of his conduct, or conform his conduct to the law was substantially impaired; and the defendant was provoked by the victim. Although Sigmon requested a charge on the statutory mitigating circumstance of age or mentality, the judge declined to give that charge, noting mental state would be covered by the other mitigating circumstances he charged.

The jury ultimately sentenced Sigmon to death. On direct appeal, this Court affirmed Sigmon's convictions and sentences. *Sigmon*, 366 S.C. 552, 623 S.E.2d 648. Sigmon subsequently filed an application for PCR. The State filed a return and motion to dismiss, and Sigmon amended his application, arguing his counsel provided ineffective assistance in failing to properly preserve various issues for appellate review, failing to adequately present evidence of his mental state, and attempting to blame the victims for the crimes. Sigmon moved for summary judgment, submitting depositions of his trial attorneys. At the hearing, the PCR court ultimate-

ly dismissed Sigmon's application. We granted Sigmon's petition for a writ of certiorari on the following issues:

I. Did the PCR court err in failing to find trial counsel ineffective when they failed to object to the solicitor's reference to his own opinion of the death penalty during his closing statement?

II. Did the PCR court err in finding trial counsel was not ineffective for failing to argue that the trial court was required to charge the jury on the statutory mitigating factor of the age and mentality of the defendant at the time of the crime under Section 16–3–20(C)(b)(7) of the South Carolina Code (2003) because evidence in the record showed Sigmon was intoxicated during the commission of the crimes?

III. Did the PCR court err in failing to find trial counsel ineffective for failing to object to the trial court's charge on non-statutory mitigation?

## STANDARD OF REVIEW

 To prevail in a PCR action, an applicant must satisfy a two prong test: he must first show his counsel's performance fell below an objective standard of reasonableness, and he is then required to prove he suffered prejudice as a result of counsel's deficient performance. *Franklin v. Catoe*, 346 S.C. 563, 570–71, 552 S.E.2d 718, 722–23 (2001) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). "However, there is a strong presumption that counsel rendered adequate assistance and exercised reasonable professional judgment in making all significant decisions in the case." *Edwards v. State*, 392 S.C. 449, 456, 710 S.E.2d 60, 64 (2011) (internal quotation omitted).

 When a defendant challenges a death sentence, prejudice is established when "there is a reasonable probability that, absent [counsel's] errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence

in the outcome of trial." *Rhodes v. State,* 349 S.C. 25, 31, 561 S.E.2d 606, 609 (2002).

The applicant in a PCR hearing bears the burden of establishing his entitlement to relief. *Suber v. State,* 371 S.C. 554, 558, 640 S.E.2d 884, 886 (2007). We will uphold the PCR court's findings if supported by evidence of probative value within the record and we will only reverse where there is an error of law. *Lomax v. State,* 379 S.C. 93, 101, 665 S.E.2d 164, 168 (2008).

## LAW/ANALYSIS

### I. CLOSING ARGUMENT

Sigmon argues the trial court erred in not finding his counsel ineffective for failing to object to the State's closing arguments because the Solicitor expressed his own opinion as to why the death penalty was the appropriate punishment and thereby injected an arbitrary factor into the proceedings in violation of the Eighth Amendment and Section 16–3–25(C)(1) of the South Carolina Code (2003). We disagree.

"A solicitor's closing argument must not appeal to the personal biases of the jurors nor be calculated to arouse the jurors' passions or prejudices, and its content should stay within the record and reasonable inferences to it." *Humphries v. State,* 351 S.C. 362, 373, 570 S.E.2d 160, 166 (2002). "When a solicitor's personal opinion is explicitly injected into the jury's deliberations as though it were in itself evidence justifying a sentence of death, the resulting death sentence may not be free from the influence of any arbitrary factor...." *State v. Woomer,* 277 S.C. 170, 175, 284 S.E.2d 357, 359 (1981). However, "[i]mproper comments do not automatically require reversal if they are not prejudicial to the defendant." *Simmons v. State,* 331 S.C. 333, 338, 503 S.E.2d 164, 166 (1998). "The relevant question is whether the solicitor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at 338, 503 S.E.2d at 166–67.

During his closing argument, the solicitor stated:

Now, when we asked for the death penalty, it's a fair and appropriate question for you to say back to me, *Solicitor*

*Ariail, why do you think that the death penalty is an appropriate punishment in this case? And I can best summarize it by a response that I got from a juror in another case on voir dire, and that juror said, as to her response in her argument for the death penalty, that they're* [sic] *are mean and evil people who live in this world, who do not deserve to continue to live with the rest of us, regardless of how confined they are.* And that's what the basis of our request for the death penalty is. There are certain mean and evil people that live in this world that do not deserve to continue to live with us.

. . . .

And there are people, there are people who will argue that the death penalty is not a deterrent. But *my response as the solicitor of this circuit is, it is a deterrent to this individual and that is what we are asking, is to deter Brad Sigmon and send the message that this type of conduct will not be tolerated in Greenville County, or anywhere in this State.* And let that decision that you reach ring like a bell from this courthouse, that people will understand that we will not accept brutal behavior such as this. Thank you.

(emphasis added). Trial counsel did not object.

When deposed for the PCR hearing, counsel stated he considered this personal reference inappropriate, and it was his understanding that such statements would be inadmissible. He further noted that if he had not objected to it, it was either because he "missed it or was oblivious." Nevertheless, the PCR court concluded that the statements would not justify an objection because they did not diminish the role of the jury in rendering a death sentence nor were they inflammatory. Instead, it found the closing argument was overall tailored to the facts within the record regarding the specific crimes at issue.

Although within this portion of the closing the solicitor appears to be asking the jurors to accord some weight to his determination of the appropriateness of the death penalty, we do not believe the statements are objectionable within the context of his entire argument. Sigmon relies on *Woomer* in arguing that the comments were inadmissible. In *Woomer,* we reversed a death sentence on direct appeal where the solicitor's argument plainly attempted to minimize the jurors'

sense of responsibility in choosing death. *Woomer*, 277 S.C. at 175, 284 S.E.2d at 360. We held the solicitor's statements were inadmissible because he repeatedly stated that he himself had undertaken the same difficult process. Specifically, he stated:

> [T]he initial burden in this case was not on you all. It was on me. I am the only person in the world that can decide whether a person is going to be tried for his life or not.... I had to make this same decision, so I have had to go through the same identical thing that you all do. It is not easy.

*Id.* at 175, 284 S.E.2d at 359. Unlike the statements in that case, we do not find the solicitor's comments here diminished the role of the jury in sentencing Sigmon to death. Although the solicitor mentioned his own considerations, he did not go so far as to compare his undertaking in requesting the death penalty to the jury's decision to ultimately impose a death sentence. His statements were not designed to diminish the jury's role and therefore, did not result in the prejudice identified in *Woomer*.

Instead, we find the statements more akin to those we upheld on direct appeal in *State v. Bell*, 302 S.C. 18, 393 S.E.2d 364 (1990), where the solicitor told the jury that "if this [wasn't] a case in which a jury should impose the death penalty, if this [wasn't] the type of case in which the State should seek the death penalty and expect the death penalty, then there is none." *Id.* at 33, 393 S.E.2d at 372 (alterations in original). He further implored the jury to "do what is right," stating "if it was not right in this case, it was never right." We held that these statements were easily distinguishable from the statements in *Woomer*, noting they did not lessen the role of the jury in sentencing death by mentioning the solicitor's role in the process and did not contain the solicitor's personal opinions. As *Bell* illustrates, the solicitor has some leeway in referencing the State's decision to request death, provided he does not go so far as to equate his initial determination with the jury's ultimate task of sentencing the defendant. Although the solicitor here articulated why he chose to request the death penalty, he did not equate his role with that of the jury.

Furthermore, examining the closing argument as a whole, we find the solicitor often emphasized the important role the jury played in determining the appropriate sentence. He acknowledged that this was a "tough decision for [it] to have to make" but that it was "a responsibility that the government places upon its citizens." Although Sigmon makes much of the solicitor's frequent references to the fact that he represented the State, we fail to discern the error. The jurors were aware the State brought the charges against Sigmon and knew the State was asking for the death penalty. It is reasonable to assume that the jury therefore inferred that the solicitor believed death was the appropriate sentence. We therefore find trial counsel were not deficient for not objecting to the State's closing argument.

## II. STATUTORY MITIGATING CIRCUMSTANCES

Sigmon also argues his trial counsel were ineffective in failing to obtain a charge on the statutory mitigating circumstance of age or mentality because evidence at trial established he was intoxicated at the time of the murders. We disagree.

We have held that where there is evidence that the defendant was intoxicated at the time the crime was committed, the trial judge is *required* to submit the mitigating circumstances in section 16–3–20(C)(b)(2), (6), and (7). *State v. Vazquez*, 364 S.C. 293, 301, 613 S.E.2d 359, 363 (2005), *abrogated on other grounds by State v. Evans*, 371 S.C. 27, 637 S.E.2d 313 (2006). Sigmon contends evidence in the record clearly demonstrates he was intoxicated at the time of the murders and his trial attorneys were ineffective for not making this argument to obtain the charge of statutory mitigation for age or mentality. However, we find there is evidence of probative value supporting the PCR court's finding that Sigmon was not intoxicated at the time of the murders.

During the penalty phase, counsel requested a charge pursuant to section 16–3–20(C)(b)(7) on "the age or mentality of the defendant at the time of the crime" based on the evidence presented as to Sigmon's mental state at the time of the murders. This mitigating circumstance would be in addition to the other mitigating circumstances the court charged under section 16–3–20(C)(b): that (1) "[t]he defendant has no significant history of prior criminal conviction involving the use of

violence against another person;" that (2) "[t]he murder was committed while defendant was under the influence of mental or emotional disturbance;" (6) that "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired;" and that (8) "[t]he defendant was provoked by the victim into committing the murder." The trial court declined to charge (7), concluding any inference from mental state was encapsulated in (6).

In his deposition for Sigmon's PCR hearing, trial counsel admitted that upon reading the statute anew, it did appear that subsection (7) was substantively different from subsection (6), but also stated he had "no knowledge or memory of distinction on these issues then or now." He further stated that at trial he thought "the facts were the thing that would carry the day, not any charge [the court] happened to give about mitigation." The PCR court ultimately found there was insufficient evidence of intoxication at the time of the crime to require charges pursuant to section 16-3-20(C)(b)(2), (6), and (7) and thus found that it was not ineffective assistance to only obtain charges on (2) and (6).

Although the record supports the conclusion Sigmon ingested drugs and alcohol prior to the murders, it does not establish he was intoxicated when he committed the crimes. At trial, Sigmon presented evidence through testimony of Strube and Dr. Morton that the night before he committed the crimes he smoked crack cocaine and consumed alcohol. Dr. Morton testified that given Sigmon's history of drug use, the effect of the substances could last up to twenty-eight days. However, his testimony focused on Sigmon's other mental instabilities, such as his recurrent major depressive disorder and his chemical dependency disorders, and their psychological effects; it did not pertain to whether Sigmon was intoxicated at the time of the crime. Furthermore, Strube testified that on the night before the murders, he and Sigmon were smoking crack cocaine and drinking beer, but ran out of crack at some point in the evening, and Strube went to sleep. Although this supports the conclusion that Sigmon ingested crack and alcohol in the evening and possibly into the early morning, it does not necessarily indicate Sigmon was still intoxicated when he entered the Larkes' home the next morning.

Additionally, trial counsel stated in his deposition that he did not attribute Sigmon's behavior to intoxication, but to psychological problems. He noted Sigmon's issues with abandonment, which were exacerbated by Becky's behavior during the break-up, stating Sigmon was "wound up like a top when he committed this crime." When asked whether he considered the drug and alcohol use as evidence of Sigmon's intoxication at the time the crimes were committed, counsel responded, "I absolutely cannot tell you whether we considered intoxication ... I don't remember ever thinking he was drunk."

Thus, the record supports the PCR court's finding that Sigmon was not intoxicated at the time of the murders, and therefore his attorneys were not deficient for failing to argue that his intoxication warranted the charge of mitigating factor (7).

## III. NON–STATUTORY MITIGATING FACTORS CHARGE

Sigmon finally argues trial counsel was ineffective for failing to object to the trial court's instructions on non-statutory mitigating circumstances because the charge disparaged the legitimacy of this type of evidence. We disagree.

"A jury instruction must be viewed in the context of the overall charge." *State v. Hicks*, 330 S.C. 207, 218, 499 S.E.2d 209, 215 (1998). "The test to determine the propriety of the trial judge's charge is what a reasonable juror would have understood the charge to mean." *State v. Bell*, 305 S.C. 11, 16, 406 S.E.2d 165, 168 (1991). "The sentencing jury in a capital case may not be precluded from considering as mitigating evidence any aspect of the defendant's character or record and any circumstances of the crime that may serve as a basis for a sentence less than death." *Id.* at 19, 406 S.E.2d at 170.

During the sentencing phase of the trial, the court charged the jury to consider non-statutory factors of mitigation as follows:

[A] mitigating circumstance is neither a justification or [sic] an excuse for the murder. It's [sic] simply lessens the degree of one's guilt. That is it makes the defendant less blameworthy, or less culpable.

. . . .

> A non-statutory mitigating circumstance is one that is not provided for by statute, but it is one which the defendant claims serves the same purpose. That is to reduce the degree of his guilt in the offense.

Sigmon argues the instructions improperly narrowed the evidence the jury would consider in mitigation to factors relating specifically to the crime, to the exclusion of other evidence presented, such as Sigmon's adaptability to prison life, acceptance of responsibility for his actions, and remorse for the crimes.

However, Sigmon analyzes this language in isolation. The court's overall charge to the jury included the instruction that the jury could consider:

> whether the defendant should be sentenced to life imprisonment for any reason, or for no reason at all.... In other words you may choose a sentence of life imprisonment if you find a statutory or non-statutory mitigating circumstance, or you may choose a sentence of life imprisonment as an act of mercy.

Thus, the court clearly indicated the jury's power to consider any circumstance in mitigation, and a reasonable juror would have known he could consider *any* reason in deciding whether to sentence Sigmon to death. We further disagree with Sigmon's contention that the charge effectively reduced the weight of non-statutory circumstances. The court did not describe those circumstances as "not provided for by law," as Sigmon contends, but instead simply distinguished them from the statutory circumstances by stating they were "not provided for by statute." The qualification seems to have been added for clarity, not to inject a hierarchy into mitigating circumstances. We therefore find trial counsel were not deficient for not objecting to the charge.

## CONCLUSION

We find Sigmon has not presented evidence that trial counsel were deficient. In light of this conclusion, it is not necessary for us to reach the second prong of prejudice in analyzing Sigmon's claim of ineffective assistance of counsel. Accordingly, we affirm the PCR court's dismissal of Sigmon's application for post-conviction relief.

TOAL, C.J., BEATTY, and KITTREDGE, JJ., concur.

PLEICONES, J., concurring in result only.