776 S.E.2d 101

Ruben RAMIREZ, Petitioner,

v.

STATE of South Carolina, Respondent.

Appellate Case No. 2012–208626.

No. 5337.

Court of Appeals of South Carolina.

Heard June 10, 2015.

Decided July 29, 2015.

Rehearing Denied Sept. 3, 2015.

352

Deputy Chief, Appellate Defender, Wanda H. Carter, of Columbia, for petitioner.

Attorney General, Alan McCrory Wilson and Senior Assistant Deputy Attorney General, Karen Christine Ratigan, both of Columbia, for respondent.

KONDUROS, J.

In this post-conviction relief (PCR) action, Ruben Ramirez contends the PCR court erred in dismissing his application for PCR and finding plea counsel was not ineffective for failing to obtain an independent competency evaluation before allowing Ramirez to plead guilty but mentally ill

(GBMI)[1] to assault and battery with intent to kill (ABWIK), kidnapping, first-degree criminal sexual conduct (CSC) with a minor, first-degree burglary, and committing a lewd act upon a child.[2] We are constrained by our standard of review to affirm the PCR court's order of dismissal.

## FACTS/PROCEDURAL HISTORY

On November 3, 2008, Ramirez pled GBMI to ABWIK, kidnapping, first-degree CSC with a minor, first-degree burglary, and committing a lewd act upon a child. At the guilty plea hearing, Ramirez informed the plea court he was eighteen

1. *See* S.C.Code Ann. § 17–24–20(A) (2014) ("A defendant is [GBMI] if, at the time of the commission of the act constituting the offense, he had the capacity to distinguish right from wrong or to recognize his act as being wrong ..., but because of mental disease or defect he lacked sufficient capacity to conform his conduct to the requirements of the law.").

2. The PCR court also found "a belated appeal from [Ramirez's] guilty plea [was] warranted." In Ramirez's petition for a writ of certiorari, he argued the PCR court properly granted his request for a belated direct appeal. However, after this court granted Ramirez's petition, Ramirez did not brief his argument that he was entitled to a belated direct appeal or address any direct appeal issues. Therefore, Ramirez abandoned his arguments relating to the belated direct appeal. *See* Rule 243(i)(1), SCACR ("When the [PCR court] has affirmatively found that the right to a direct appeal was not knowingly and intelligently waived, the petition shall contain a question raising this issue along with all other [PCR] issues petitioner seeks to have reviewed."); *Wright v. Craft,* 372 S.C. 1, 20, 640 S.E.2d 486, 497 (Ct.App.2006) ("An issue raised on appeal but not argued in the brief is deemed abandoned and will not be considered by the appellate court." (internal quotation marks omitted)).

Moreover, even if Ramirez had not abandoned his direct appeal arguments, we conclude he was not entitled to a belated direct appeal. The only ground Ramirez raised during the PCR hearing addressed whether plea counsel was ineffective for failing to have Ramirez's competency reevaluated. Although Ramirez asserted he was not advised of his right to a direct appeal in his PCR application, he presented no testimony or evidence in support of this allegation at the PCR hearing. The PCR court's order dismissing Ramirez's PCR application did not rule on the direct appeal issue and Ramirez's motion to reconsider did not raise it. Accordingly, even if Ramirez had briefed his direct appeal arguments, the PCR court erred because no evidence supports its conclusion that Ramirez was entitled to a belated direct appeal. *See Lee v. State,* 396 S.C. 314, 319, 721 S.E.2d 442, 445 (Ct.App.2011) ("Any evidence of probative value in the [appendix] is sufficient to uphold the PCR court's ruling.").

years old, had completed the eighth grade, and could read and write. He claimed he had never been treated for mental illness or emotional problems. Ramirez stated he was in court because he was "charged with serious charges and [he knew he was] looking [at] up to life and these are serious charges and they are nothing to play with."

Plea counsel requested the plea court allow Ramirez to plead GBMI because a psychological report indicated Ramirez understood what he did was wrong but was unable to control his behavior. The State informed the plea court Ramirez underwent a competency evaluation that established he was competent to stand trial. The State introduced the competency evaluation, which was conducted when Ramirez was sixteen years old by Dr. Mayank Dalal (the Dalal evaluation).

According to the Dalal evaluation, Ramirez denied a history of inpatient or outpatient psychiatric treatment. Ramirez reported he attended regular eighth-grade classes and admitted he had been suspended from school eight times. Ramirez claimed he usually received grades of Cs or Ds in school. However, according to the Dalal evaluation, Department of Juvenile Justice (DJJ) school records revealed Ramirez received grades of 92 in language arts, 95 in math, 80 in social studies, 93 in science, and 95 in health. Ramirez denied a history of major medical or psychological problems. Dr. Dalal noted Ramirez had some speech difficulties, which he attributed to a language barrier. Dr. Dalal reported Ramirez "was oriented for time, place, person, and situation" and his thought process was logical and "goal directed." Dr. Dalal found Ramirez's "fund of knowledge was normal," his "abstraction ability was average," his "memory was within normal limits," his "attention and concentration were normal," and he "did not appear to be a danger to himself and/or others."

Dr. Dalal reported Ramirez was able to adequately read his rights and state the charges against him but he had difficulty with words like "solicitor," "evaluation," and "competency." Ramirez told Dr. Dalal his charges were "serious because that's about raping." In his report, Dr. Dalal opined Ramirez knew he could ask his attorney if he had any questions; however, he noted Ramirez could not remember his attorney's name. When informed of his attorney's name, Ramirez was

able to retain and recall the name during the evaluation. Dr. Dalal reported Ramirez knew the roles of a solicitor, judge, and jury and he was able to communicate the meaning of "guilty plea, not guilty plea, and a plea bargain." According to the evaluation, Ramirez could "state the importance of evidence, witness[es], and appropriate courtroom behavior." Dr. Dalal determined Ramirez understood the charges against him, had the ability to assist in his own defense, and was competent to stand trial. Dr. Dalal concluded Ramirez's diagnostic impressions [3] were:

AXIS I:     No Diagnosis

AXIS II:    No Diagnosis

AXIS III:   No Diagnosis

The Dalal evaluation did not include Ramirez's intelligence quotient (IQ) score.

Ramirez introduced a report from psychological evaluations conducted by Dr. Stephen Gedo (the Gedo report). Dr. Gedo conducted the evaluations over the course of five days when Ramirez was seventeen years old. Dr. Gedo obtained most of Ramirez's historical information "from collateral sources ... due to [his] intellectual limitations." [4] Ramirez told Dr. Gedo, "My mind is not right—I forget things after about [thirty] minutes, that's why punishment does not usually work with me." According to the Gedo report, "[Ramirez] was reportedly mentally retarded from birth. He reportedly did not begin speaking until age seven, and had consistent problems in school, being placed in special education classes, and being passed along even though he failed grades." Dr. Gedo noted Ramirez was diagnosed with attention deficit hyperactivity disorder (ADHD) when he was nine years old.

---

3. "There are five axes included in the DSM–IV multiaxial classification." *Diagnostic and Statistical Manual of Mental Disorders* 27 (4th ed.1994). Axis I includes clinical disorders and other conditions that may be a focus of clinical attention, Axis II includes personality disorders and mental retardation, Axis III includes general medical conditions, Axis IV includes psychological and environmental problems, and Axis V includes a global assessment of functioning (GAF) rating. *Id.*

4. In addition to psychological testing, Dr. Gedo reviewed Ramirez's medical records and interviewed several of his family members.

According to the Gedo report, Ramirez's "[t]hought patterns were concrete, simplistic, and often vague. He appeared to become confused easily, and his attention [appeared] to wander at times." Dr. Gedo reported Ramirez "was clearly cognitively limited across the entire range of cognitive functioning," and his "[judgment] and insight appeared poor." Dr. Gedo noted that although Ramirez "appeared to have no difficulty comprehending English, or responding appropriately to verbal or written questions," he had "difficulty understanding some words, such as 'conscience,' 'intercourse,' and 'ideal.'" Dr. Gedo reported Ramirez "readily asked for explanations" when he misunderstood a word.

Dr. Gedo's intellectual testing on Ramirez revealed Ramirez's IQ score was between 31 and 44, which "[fell] within the [Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM–IV)] category of Severe Mental Retardation." According to the report, personality testing on Ramirez revealed his "most problematic areas [were] . . . related to intellectual functioning." Dr. Gedo noted, "Those who respond[ed] similarly often have cognitive limitations and difficulty with achievement, with interventions which may include retention in grade, and/or placement in special education courses. Inadequate language skills[] and limited reading comprehension are suggested." Dr. Gedo concluded Ramirez's intellectual functioning was the equivalent of a four- to seven-year-old child.

Dr. Gedo further concluded Ramirez conveyed the impression of an adolescent who had been "intellectually impaired[] and developmentally delayed throughout most, if not all, of his life," and he noted Ramirez had "a diagnosable psychological condition of significance, ADHD." Dr. Gedo determined Ramirez was "likely to be highly malleable; that is, to be strongly influenced by those around him, and treatment which addresses the ADHD pharmacologically, as well as teaches coping/social skills would be important in assisting him to adapt effectively to societal standards, and to have better interactions with his peers." Finally, Dr. Gedo concluded Ramirez's diagnostic impressions were:

AXIS I: [ADHD], Combined Type. R/0 Adjustment Disorder with Mixed Disturbance of Emotions & Conduct.

AXIS II:    Severe Mental Retardation.

AXIS III:   None known.

AXIS IV:    Problems related to social environment[,] educational problems, problems with access to health care services.

AXIS V:     Present Level: 35 [5] Highest in Past Year: 35

The Gedo report did not include a finding regarding Ramirez's competency to stand trial.

After the parties introduced the Dalal evaluation and Gedo report, the plea court found Ramirez suffered from "a mental illness," which included diagnoses of ADHD, "[judgment] disorder with mixed emotion of disturbance and conduct," and "severe mental retardation." As a result, the plea court allowed Ramirez to enter pleas of GBMI to his charges. However, before sentencing, the plea court noted Ramirez's "[IQ] level [was] as low as any [it had] ever seen." Nonetheless, the plea court sentenced Ramirez to concurrent sentences of twenty years' imprisonment for ABWIK, kidnapping, first-degree CSC with a minor, and first-degree burglary. The plea court sentenced Ramirez to a consecutive sentence of fifteen years' imprisonment, suspended upon five years' probation and mental health counseling, for committing a lewd act upon a child. Ramirez did not file a direct appeal.

Ramirez filed an application for PCR on November 2, 2009, and his PCR hearing was held on May 9, 2011. At the beginning of the PCR hearing, PCR counsel noted Ramirez was proceeding "solely on the psychological ground." PCR counsel introduced the Dalal evaluation and the Gedo report into evidence, and the only witness he called to testify was

---

5. The GAF rating is scored on a scale of 0 to 100, and a rating of between 31 and 40 suggests:

Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing school).

*Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed.1994). A subject's GAF rating can vary depending on treatment and other factors. Id. at 32–33.

plea counsel.[6] Plea counsel admitted he obtained the Gedo report because he had trouble communicating with Ramirez and had an indication "something wasn't right with him." Plea counsel stated Ramirez "was very naive," and he did not believe Ramirez "quite understood the gravity of the ... offenses that he had committed." Plea counsel explained he did not believe Ramirez "understood everything that was going on."

Plea counsel acknowledged the Dalal evaluation determined Ramirez was competent to stand trial. Plea counsel agreed he paid close attention to the Dalal evaluation because Ramirez was having trouble comprehending "what was going on around him." Plea counsel explained he hired Dr. Gedo to perform a psychological evaluation on Ramirez because he did not understand various aspects of the Dalal evaluation. Plea counsel testified Dr. Gedo met with Ramirez five times and each visit lasted between three and four hours. Plea counsel noted Dr. Dalal met with Ramirez on one occasion for about one and a half hours.

Plea counsel testified that in preparing for Ramirez's case, he reviewed a Highlands County, Florida, School Board Assessment[7] that indicated Ramirez "performed better than approximately [1%] of his peers." Plea counsel testified that after he received the Gedo report, he consulted the DSM–IV and determined an IQ score of 70 is "the level for mental retardation," and an IQ score between 35 and 40 is the level of "severe mental retardation." Plea counsel admitted that despite the results of the Gedo report, he did not seek an independent competency evaluation for Ramirez; however, he admitted it would have been "prudent" to reevaluate Ramirez's competency.

On cross-examination, plea counsel stated Dr. Gedo never suggested Ramirez should be reevaluated for competency to stand trial. Plea counsel asserted Ramirez "was never tough to communicate with"; however, plea counsel believed Ramirez "was a child.... I still saw him as a little boy." He

---

6. Ramirez did not testify at the PCR hearing.

7. Ramirez was born in Florida but moved to South Carolina in 2006. The Highlands County School Board Assessment was not offered into evidence at the PCR hearing.

stated he explained to Ramirez what they would be doing in court on the day of his pleas and at the time, Ramirez appeared to understand. However, plea counsel stated he questioned whether Ramirez understood what they were doing in court on the day of his pleas.

Plea counsel testified that after he obtained the Gedo report, he determined Ramirez's inculpatory statement to police could not be suppressed, so he pursued GBMI pleas. He asserted that if Dr. Gedo had indicated an additional competency evaluation was necessary, he would have pursued one. Plea counsel testified that on the day Ramirez pled guilty, he was comfortable with Ramirez's decision to enter GBMI pleas.

After Ramirez rested his case, the State argued he failed to establish he was prejudiced by plea counsel's performance because he did not present expert testimony or other evidence demonstrating an independent competency evaluation would have found him incompetent to stand trial. In response, PCR counsel requested the PCR court hold the record open and order Ramirez to undergo a new competency evaluation. PCR counsel admitted the competency evaluation could have been conducted prior to the PCR hearing; however, he noted competency evaluations are costly and Ramirez's family was "of meager financial background." PCR counsel stated he needed to review Ramirez's DJJ records to determine if an independent competency evaluation was necessary before petitioning the PCR court to order Ramirez to undergo such an evaluation. The PCR court determined "the record [was] sufficiently complete to make a decision on [the] issue as to whether or not [plea counsel] met the *Strickland*[8] guidelines," and it took the matter under advisement.

On May 23, 2011, while Ramirez's PCR application was still under advisement, he filed a motion to hold the record open to allow him to undergo an independent competency evaluation. Ramirez claimed the new competency evaluation was scheduled for eight days later—on May 31, 2011.

On August 1, 2011, the PCR court issued an order dismissing Ramirez's PCR application. In the order, the PCR court also denied Ramirez's motion to hold the record open, conclud-

---

8. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

ing Ramirez's competency was the sole issue Ramirez presented during the PCR hearing and his opportunity to introduce an independent competency evaluation was during the hearing. Regarding Ramirez's PCR application, the PCR court determined plea counsel "provided credible testimony about his decision-making process," and it noted Ramirez had "ample time" to obtain an independent competency evaluation before the PCR hearing. The PCR court concluded, "Plea counsel sought an independent psychological evaluation, did not have trouble communicating with his client, and made the strategic choice to pursue a plea of [GBMI] when ... plea counsel determined there was no basis to suppress [Ramirez's] statement to police." The PCR court further concluded, "[A]s neither expert testimony nor a second competency evaluation were presented at the PCR hearing, discussion about the potential impact of such an evaluation is purely speculative."

Ramirez filed a Rule 59(e), SCRCP, motion requesting the PCR court reconsider its denial of his motion to hold the record open and its dismissal of his PCR application and to consider the competency evaluation of Dr. Thomas Martin (the Martin evaluation), conducted twenty-two days after the PCR hearing. Ramirez attached the Martin evaluation to the Rule 59(e) motion. According to the Martin evaluation, Dr. Martin consulted the following sources of information: police reports; Ramirez's 2007 handwritten statement to police; the Dalal evaluation; Highlands County, Florida, School District (the School District) records; the School District's psychological records and reports; the Gedo report; Ramirez's pediatric medical records; and a two-and-a-half-hour psychiatric interview with Ramirez. According to the Martin evaluation, in 1998, the School District determined Ramirez had an IQ of 57. Additionally, Dr. Martin noted the School District found:

Ramirez's social adaptive behavior was ... markedly deficient. . . . He demonstrated poor communication skills, poor daily living skills, and poor social skills in follow-up adaptive behavior assessments. Overall, [Ramirez] was found to have a low adaptive level that only confounded his low intellectual ability. Based on his multiple intellectual, language[,] and social deficiencies, [Ramirez] was placed in the school district's special education program.

According to the Martin evaluation, Ramirez was "simple-minded, intellectually and socially deficient, easily confused[,] . . . highly suggestible with facts and history," and "easily manipulated into agreement." Dr. Martin determined Ramirez "behaved child-like and immature for his age" and "appeared to have a very low level of intellectual functioning." According to the Martin evaluation, "A basic cognitive examination revealed deficits in [Ramirez's] memory, insight[,] and judgment. He was highly suggestible, easily influenced into acknowledging erroneous data, and appeared to react and give answers to please the Examiner." Dr. Martin determined Ramirez's diagnostic impressions were:

AXIS I:　ADHD, by history

AXIS II:　Mental Retardation, Full Scale [IQ]: 31–57, with significant documented deficiencies in adaptive social behavior.

AXIS III:　No Major Medical Illness

AXIS IV:　Psychosocial Stressors: Incarceration, legal issues, and separation from his family.

AXIS V:　[GAF rating:] 45 [9]

Dr. Martin concluded Ramirez suffered from "severe mental retardation with coexistent maladaptive social and language skills" and was incompetent to stand trial. Dr. Martin noted Ramirez could recite the charges once levied against him and vocalize "a vague and inconsistent impression of the purpose of a PCR action." However, Dr. Martin found:

[Ramirez] seem[ed] to have developed a blind trust for [PCR counsel], and vocalized his plan to follow his advice at all times, without question. He also attempted to describe the basic roles of the [p]rosecutor and the [j]udge as it applies to his current situation. [Ramirez] was not consistent or always accurate with his reported understanding of his legal case. He was able to concretely [c]ite several pertinent facts related to his case and how they might be part of his PCR, but there was no true evidence or indica-

---

9. A GAF rating of between 41 and 50 suggests: "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed.1994).

tion that he possesse[d] rational or abstract understanding or applicative ability that is also necessary to formulate a viable court presentation.

Dr. Martin concluded Ramirez's presentation "was consistent with documented findings in [his] early school records and [the Gedo report]. In light of his history and current presentation, it remains unclear ... how [Ramirez] was ever found 'competent to stand trial,' to viably assist his attorney, and offer a guilty plea in 2008."

The PCR court denied Ramirez's motion to reconsider but sua sponte granted him a belated direct appeal. Ramirez filed a petition for a writ of certiorari from the PCR court's order. This court granted certiorari.

## STANDARD OF REVIEW

On certiorari, we will affirm if any evidence of probative value supports the PCR court's findings and reverse only when an error of law controls the PCR court's decision. *Sigmon v. State,* 403 S.C. 120, 128, 742 S.E.2d 394, 398 (2013). This court gives great deference to the PCR court's determinations of credibility. *Walker v. State,* 407 S.C. 400, 405, 756 S.E.2d 144, 146 (2014).

## LAW/ANALYSIS

### I. Ineffective Assistance of Counsel

Ramirez argues the PCR court erred in dismissing his PCR application because plea counsel was ineffective for failing to obtain an independent competency evaluation before the plea hearing. We disagree.

Trial counsel must provide "reasonably effective assistance" under "prevailing professional norms." *Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Reviewing courts presume trial counsel was effective. *Id.* at 690, 104 S.Ct. 2052. Thus, to receive relief, a PCR applicant must first show trial counsel's performance was deficient based on a standard of "reasonableness under prevailing professional norms." *Id.* at 688, 104 S.Ct. 2052. Second, an applicant must show trial counsel's deficient performance prejudiced his defense by depriving him "of a fair trial ... whose result is reliable." *Id.* at 687, 104 S.Ct. 2052.

"Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Id.* at 700, 104 S.Ct. 2052.

A guilty plea defendant is also entitled to the effective assistance of plea counsel. *Hill v. Lockhart,* 474 U.S. 52, 58, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985); *Hyman v. State,* 397 S.C. 35, 43, 723 S.E.2d 375, 379 (2012). The two-prong *Strickland* analysis applies to PCR claims alleging plea counsel was ineffective. *Hill,* 474 U.S. at 58, 106 S.Ct. 366. "In the context of a guilty plea, the deficiency prong inquiry turns on whether the plea was voluntarily, knowingly, and intelligently entered." *Taylor v. State,* 404 S.C. 350, 360, 745 S.E.2d 97, 102 (2013). To show prejudice, a guilty plea defendant must establish there is a reasonable probability that, but for plea counsel's errors, he would not have pled guilty and would have insisted on going to trial. *Hill,* 474 U.S. at 58–60, 106 S.Ct. 366; *Hyman,* 397 S.C. at 43, 723 S.E.2d at 379. The prejudice prong "focuses on whether [plea] counsel's constitutionally ineffective performance affected the outcome of the plea process." *Taylor,* 404 S.C. at 360, 745 S.E.2d at 102 (internal quotation marks omitted). "In determining guilty plea issues, it is proper to consider the guilty plea transcript as well as evidence at the PCR hearing." *Bennett v. State,* 371 S.C. 198, 204, 638 S.E.2d 673, 675 (2006).

"Counsel must articulate a *valid* reason for employing a certain strategy to avoid a finding of ineffectiveness." *Vail v. State,* 402 S.C. 77, 88, 738 S.E.2d 503, 509 (Ct.App.2013) (internal quotation marks omitted). "Where counsel articulates a strategy, it is measured under an objective standard of reasonableness." *Id.* (internal quotation marks omitted).

"Due process prohibits the conviction of an incompetent defendant, and this right may not be waived by a guilty plea." *Matthews v. State,* 358 S.C. 456, 458, 596 S.E.2d 49, 50 (2004). "The test of competency to enter a plea is the same as required to stand trial." *Jeter v. State,* 308 S.C. 230, 232, 417 S.E.2d 594, 596 (1992). "The accused must have sufficient capability to consult with his lawyer with a reasonable degree of rational understanding and have a rational as well as factual understanding of the proceedings against him." *Id.* "To show prejudice within the context of [plea] counsel's failure to fully

investigate [a PCR applicant's] mental capacity, the [applicant] need only show a reasonable probability that he was either insane at the time [the crime was committed] or incompetent at the time of the plea." *Lee v. State*, 396 S.C. 314, 320, 721 S.E.2d 442, 445–46 (Ct.App.2011) (fourth alteration by court) (internal quotation marks omitted). "[T]he [applicant] bears the burden of proof and is required to show by a preponderance of the evidence he was incompetent at the time of his plea." *Jeter*, 308 S.C. at 232, 417 S.E.2d at 596.

In *Jeter*, the applicant argued his plea counsel was ineffective for failing to request a competency examination that could have established he was incompetent to stand trial. 308 S.C. at 233, 417 S.E.2d at 596. Our supreme court found "[t]he evidence addressed at the PCR hearing was insufficient to show deficient performance on the part of [plea] counsel," noting plea counsel testified he and the applicant discussed the applicant's case and his options on several occasions before the applicant's plea. *Id.* The applicant's family, who testified at the PCR hearing, never raised concerns about the applicant's competency to plea counsel. *Id.* As a result, our supreme court found plea counsel reasonably relied on his own perceptions, particularly because he was familiar with the applicant from previous representation. *Id.* The court concluded plea counsel's failure to request a psychiatric evaluation was not outside the range of reasonable professional assistance when nothing suggested the applicant suffered from mental illness. *Id.*

In *Matthews*, a psychiatrist testified at the applicant's PCR hearing, and in describing the applicant's mental condition, the psychiatrist referred to the applicant's quick, nonsensical responses to questions. 358 S.C. at 459, 596 S.E.2d at 51. When the psychiatrist "asked [the applicant] where he was, he gave the quick, basic response of 'here.' When asked if he was in a prison, cafeteria, or zoo, [the applicant] responded, 'zoo.' When asked what his name was, [the applicant] responded, 'me.' " [10] *Id.* at 459–60, 596 S.E.2d at 51. Our supreme court found the psychiatrist's testimony "clearly established by a preponderance of the evidence that [the applicant] was incompetent at the time he entered his guilty plea."

---

10. The applicant's plea counsel informed the plea court the applicant had an IQ of 60. *Matthews*, 358 S.C. at 459 n. 2, 596 S.E.2d at 51 n. 2.

*Id.* at 460, 596 S.E.2d at 51. As a result, the court concluded the "[applicant's plea] counsel was deficient for failing to request a *Blair*[11] hearing so that the [plea] court could examine [the applicant's] fitness to stand trial." *Id.* Our supreme court vacated the applicant's guilty plea and granted him a new trial, noting, "[Plea] counsel's failure to request a *Blair* hearing prejudiced [the applicant] under the *Jeter* standard because there was, at minimum, a 'reasonable probability' that [the applicant] was incompetent at the time of his guilty plea." *Id.*

In *Lee*, the applicant pled guilty to multiple charges in violation of his probation; however, before a probation revocation hearing could be held, the applicant was found incompetent to stand trial.[12] 396 S.C. at 316, 721 S.E.2d at 443–44. Subsequently, at the applicant's PCR hearing, the psychiatrist who conducted the applicant's competency evaluation testified the applicant's incompetence was caused by mental retardation. *Id.* at 317, 721 S.E.2d at 444. The psychiatrist further testified the applicant "had a basic understanding of his charges and to some degree the criminal process." *Id.* at 321, 721 S.E.2d at 446. The applicant's plea counsel testified the applicant appeared to understand their conversation about pleading guilty and the applicant never informed her of his mental health treatment. *Id.* at 318, 721 S.E.2d at 445. The PCR court found the applicant "failed to prove he was incompetent on the day of his guilty plea." *Id.* at 319, 721 S.E.2d at 445. On appeal, this court concluded it was "constrained to affirm the PCR court's decision" under the standard of review because "[s]ome evidence in the record support[ed] the PCR court's findings." *Id.* at 321–22, 721 S.E.2d at 446–47. This court noted the psychiatrist's testimony that the applicant's "mental status dated back to when he was in school and he had a documented history of mental retardation was sufficient to show a reasonable probability that he was incompetent at

---

11. *State v. Blair,* 275 S.C. 529, 273 S.E.2d 536 (1981).

12. The applicant's competency evaluation revealed he had an IQ of 61, completed high school, and obtained a driver's license. *Id.* at 316, 721 S.E.2d at 444. The evaluation also revealed the applicant had once been hospitalized for behavioral problems, received mental health services, was diagnosed with mild mental retardation and disruptive behavior disorder, and had a history of setting fires and engaging in cruelty to animals. *Id.* at 316–17, 721 S.E.2d at 444.

the time of the plea." *Id.* at 322, 721 S.E.2d at 447. However, this court determined the applicant failed to show his plea counsel was deficient because plea counsel "had no indication of [the applicant's] mental status." *Id.*

## A. Deficient Performance

■ The PCR court concluded Ramirez did not prove plea counsel was deficient because plea counsel "provided credible testimony about his decision-making process," "sought an independent psychological evaluation, did not have trouble communicating with [Ramirez], and made the strategic choice to pursue a plea of [GBMI] when . . . plea counsel determined there was no basis to suppress [Ramirez's] statement to police." We find the evidence in the appendix does not support the PCR court's findings on this issue.

In *Jeter* and *Lee*, our appellate courts determined the applicants' attorneys were not deficient for failing to obtain competency evaluations for their clients because the attorneys had no indication of the applicants' mental limitations. In contrast, here, plea counsel was aware of Ramirez's mental deficiencies. The PCR court partially based its conclusion on the fact that plea counsel testified he "did not have trouble communicating with [Ramirez]." However, plea counsel testified he had trouble communicating with Ramirez and had an indication "something wasn't right with him." Additionally, plea counsel described Ramirez as "very naive" and childlike, and plea counsel believed Ramirez did not "[understand] everything that was going on." Plea counsel consistently acknowledged he was aware of Ramirez's mental limitations, which is why he hired Dr. Gedo to perform a psychological evaluation. Plea counsel specifically admitted that after he received the Gedo report, he reviewed the DSM–IV and learned Ramirez's IQ score of 31 to 44 meant Ramirez was "severely mentally retarded." Plea counsel also acknowledged Dr. Gedo found Ramirez did not begin speaking until age seven and presently had the intellectual functioning of a four- to seven-year-old child. Furthermore, plea counsel acknowledged he reviewed Ramirez's School District report indicating Ramirez "performed better" than only 1% of his peers. Therefore, unlike *Jeter* and *Lee*, here, plea counsel was aware of Ramirez's mental limitations before the plea hearing. As a result, the PCR court's finding plea counsel was not deficient

because he "did not have trouble communicating with [Ramirez]" is unsupported by the evidence. At minimum, plea counsel's review of the Gedo report should have led him to seek an independent competency evaluation.

Moreover, we find the PCR court erred in determining plea counsel's decision not to obtain an independent competency evaluation so he could pursue pleas of GBMI was a valid strategy. Plea counsel's strategy was not objectively reasonable because if Ramirez was incompetent at the time of his pleas, he could not have been convicted of his crimes. *See Vail,* 402 S.C. at 88, 738 S.E.2d at 509 ("Where counsel articulates a strategy, it is measured under an objective standard of reasonableness." (internal quotation marks omitted)); *Matthews,* 358 S.C. at 458, 596 S.E.2d at 50 ("Due process *prohibits the conviction of an incompetent defendant,* and this right may not be waived by a guilty plea." (emphasis added)). As a result, by pursuing pleas of GBMI in lieu of obtaining an independent competency evaluation, plea counsel departed from professional norms, resulting in deficient performance. *See Strickland,* 466 U.S. at 688, 104 S.Ct. 2052 (explaining to prove deficient performance, an applicant must show counsel departed from professional norms).

### B. Prejudice

██ The PCR court concluded Ramirez did not prove he was prejudiced by plea counsel's allegedly deficient performance because he did not establish there was a reasonable probability he was incompetent at the time of his guilty pleas. In reaching this conclusion, the PCR court relied upon the Dalal evaluation, "the [Gedo report's] description of [Ramirez's] understanding of the events leading up to his charges[,] and plea counsel's testimony regarding [Ramirez's] ability to communicate and understand the proceedings." The PCR court also noted "any discussion about the potential impact" of an independent evaluation was "purely speculative" because Ramirez did not introduce an independent competency evaluation or expert testimony at the PCR hearing. Although we acknowledge Ramirez failed to challenge the Dalal evaluation by introducing an independent competency evaluation at the PCR hearing, we are troubled by many aspects of the Dalal evaluation in light of the Gedo report and plea counsel's testimony.

For example, the Dalal evaluation relied on Ramirez's self-reporting [13] to determine he was in regular eighth grade classes; had normal memory,[14] attention, and concentration; and achieved As and Bs in his DJJ classes. The evaluation also did not include Ramirez's IQ score. Conversely, the Gedo report relied on psychological testing, Ramirez's medical records, and interviews with Ramirez's family members in determining Ramirez was mentally retarded from birth and did not begin speaking until age seven; was previously diagnosed with ADHD; was placed in special education classes, which he passed even though he made failing grades; was "limited across the entire range of cognitive functioning"; had an IQ between 31 and 44, which fell within the category of "severe mental retardation"; had the intellectual functioning of a four- to seven-year-old child; and was "likely to be highly malleable" and "strongly influenced by those around him." [15] Furthermore, plea counsel admitted he hired Dr. Gedo because he believed Ramirez "acted like a child," did not understand the gravity of the offenses he committed, and did not "[understand] everything that was going on." Plea counsel also testified a School District report found Ramirez "performed better" than only 1% of his peers.

Based on the disparate findings of the Dalal evaluation and Gedo report, combined with plea counsel's testimony, we believe there was at least a reasonable probability Ramirez was incompetent at the time of his pleas. *See Lee,* 396 S.C. at 322, 721 S.E.2d at 447 (explaining a psychiatrist's testimony that an applicant's "mental status dated back to when he was in school and he had a documented history of mental retarda-

---

13. Dr. Dalal did not consult the School District records, medical records, or family members to determine the validity of Ramirez's statements. Additionally, Dr. Dalal did not indicate whether he conducted any psychological testing on Ramirez in concluding Ramirez was competent.

14. Dr. Dalal also reported Ramirez could not remember plea counsel's name.

15. We find Dr. Gedo's assertion Ramirez is "likely to be highly malleable" and "strongly influenced by those around him" particularly concerning because those traits could have affected Ramirez's self-reporting during the Dalal evaluation.

tion was sufficient to show a reasonable probability that he was incompetent at the time of the plea"); *id.* at 316–17, 721 S.E.2d at 444 (noting an applicant's competency evaluation found him incompetent when he had an IQ of 61, had been diagnosed with mild mental retardation and disruptive behavior disorder, had completed high school, had obtained a driver's license, had once been hospitalized for behavioral problems, and had a history of setting fires and engaging in cruelty to animals).

However, although we may have decided this issue differently, we are constrained by our standard of review to affirm the PCR court's finding Ramirez did not prove he was prejudiced by plea counsel's performance. We find evidence of probative value (the Dalal evaluation) supports the PCR court's finding, and further, PCR counsel failed to introduce an independent competency evaluation during the PCR hearing. *See id.* at 320, 721 S.E.2d at 446 ("Any evidence of probative value to support the PCR court's factual findings is sufficient to uphold those findings on appeal."); *Black's Law Dictionary* 1397 (10th ed.2014) (defining "probative value" as "[t]he degree to which one fact tends to make probable another posited fact"); *see also Walker*, 407 S.C. at 405, 756 S.E.2d at 146 (providing this court gives great deference to the PCR court's determinations of credibility).

## II. Newly–Discovered Evidence

▪▪ Ramirez argues the PCR court erred in denying his Rule 59(e) motion because the Martin evaluation was newly-discovered evidence he was incompetent when he entered his GBMI pleas.

As a threshold matter, we find Ramirez's argument the Martin evaluation was newly-discovered evidence was not preserved for this court's consideration. Based on our review of the record, Ramirez first made this argument in his petition for a writ of certiorari. Therefore, this argument is not properly before the court. *See Kolle v. State*, 386 S.C. 578, 589, 690 S.E.2d 73, 79 (2010) (concluding an issue that was neither raised to nor ruled upon by the PCR court was not preserved for appellate review).

▪▪▪ Even if Ramirez raised this argument to the PCR court, he conceded at the PCR hearing the Martin evaluation

would not be newly-discovered evidence. An element of "newly-discovered" evidence is that the evidence could not have been discovered before trial. *See Jamison v. State,* 410 S.C. 456, 467, 765 S.E.2d 123, 128 (2014) (explaining "[t]o obtain a new trial based on after discovered evidence, the [PCR applicant] must show that the evidence: (1) would probably change the result if a new trial is had; (2) has been discovered since trial; (3) *could not have been discovered before trial;* (4) is material to the issue of guilt or innocence; and (5) is not merely cumulative or impeaching" (first alteration by court) (emphasis added)). PCR counsel conceded the competency evaluation could have been obtained before the PCR hearing, but because competency evaluations are expensive and Ramirez's family is of meager financial means, he wanted to review DJJ records before obtaining an independent competency evaluation. Therefore, even if Ramirez had raised this issue to the PCR court, he is barred from arguing the Martin evaluation constituted newly-discovered evidence based on his concessions in the PCR court. *See Austin v. Stokes–Craven Holding Corp.,* 387 S.C. 22, 45–46, 691 S.E.2d 135, 147 (2010) (holding an issue is not preserved for appeal when it is conceded at trial).

## CONCLUSION

We are constrained by our standard of review to affirm the PCR court's order dismissing Ramirez's PCR application because some evidence of probative value supports the PCR court's findings. However, we are deeply troubled that a man with severe mental retardation, an IQ between 31 and 57, and the intellectual functioning of a four-to seven-year-old child was allowed to plead guilty and that a series of missteps by counsel at every level deprived Ramirez of effective review by this court.[16] Based on the foregoing, the PCR court's order of dismissal is

**AFFIRMED.**

THOMAS, J., concurs.

GEATHERS, J., dissents in a separate opinion.

---

16. At oral argument, the State conceded PCR counsel "showed up to court [without] the requisite tools to meet his burden of proof" and

GEATHERS, J., dissenting.

I respectfully dissent. In my opinion, the PCR court erred as a matter of law when it denied PCR.

"It is well established that the Due Process Clause of the Fourteenth Amendment prohibits the criminal prosecution of a defendant who is not competent to stand trial." *Medina v. California*, 505 U.S. 437, 439, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992). "This right cannot be waived by a guilty plea. The test of competency to enter a plea is the same as required to stand trial." *Jeter v. State*, 308 S.C. 230, 232, 417 S.E.2d 594, 595–96 (1992) (citation omitted). "This Court has held that to be competent to stand trial or continue trial, a defendant must have a rational, as well as factual, understanding of the proceedings against him and the ability to consult with his lawyer with a reasonable degree of rational understanding." *Hall v. Catoe*, 360 S.C. 353, 359, 601 S.E.2d 335, 338 (2004) (quotation marks omitted).

Here, even without the Martin evaluation,[17] the record before the PCR court demonstrated Ramirez lacked a rational

---

indicated Ramirez had other avenues of relief. Specifically, the State asserted Ramirez could file a writ of habeas corpus in the Supreme Court of South Carolina, and it also referenced the United States Supreme Court's decision in *Martinez v. Ryan*, —— U.S. ——, 132 S.Ct. 1309, 182 L.Ed.2d 272 (2012). In that case, the Court held:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

*Id.* at 1320. Additionally, our supreme court has held that in rare circumstances, "when the system has simply failed a defendant and where to continue the defendant's imprisonment without review would amount to a gross miscarriage of justice," a PCR applicant may be entitled to file a successive PCR application. *Aice v. State*, 305 S.C. 448, 451, 409 S.E.2d 392, 394 (1991). We note plea counsel failed to obtain an independent competency evaluation before the plea hearing, PCR counsel failed to obtain an independent competency evaluation before the PCR hearing, and appellate counsel abandoned one issue and argued one issue that was unpreserved.

17. Shortly after the PCR hearing, PCR counsel sought to admit the Martin evaluation. After a lengthy review of police reports; Ramirez's

and factual understanding of the proceedings against him and, thus, was not competent to stand trial. As the majority opinion explains, the Gedo report provided that Ramirez was born mentally retarded, his thought patterns were simplistic and vague, he was easily confused, his attention wandered at times, he was "clearly cognitively limited across the entire range of cognitive functioning," and his "[j]udgement and insight appeared poor." Additionally, Dr. Gedo opined Ramirez had difficulty understanding words, and intellectual testing revealed Ramirez's IQ score was between 31 and 44, which indicates severe mental retardation in the DSM–IV.[18]

Importantly, Dr. Gedo concluded Ramirez's intellectual functioning was equivalent to the functioning of a four to seven-year-old child, and the plea court noted Ramirez's IQ was "as low as any [the court had] ever seen."

Furthermore, as the majority explains, several aspects of the Dalal evaluation, which were primarily relied on to determine competency, are concerning as Dr. Dalal relied heavily on Ramirez's self-reporting; did not consult school records, medical records, or family members; did not indicate whether any psychological testing was completed; and did not include Ramirez's IQ score. By contrast, in the Gedo report, Dr. Gedo relied on psychological testing, Ramirez's medical records, and interviews with Ramirez's family members in reaching the conclusion that Ramirez's intellectual functioning was stunted and he had the mental capacity of a four to seven-year-old child.

statement to police; the Dalal evaluation and Gedo report; school records; psychological records and reports; pediatric medical records; and a psychiatric interview with Ramirez, Dr. Martin opined Ramirez was incompetent to stand trial at the time he entered the guilty plea. Dr. Martin stated, "In light of his history and current presentation, it remains unclear ... how [Ramirez] was ever found 'competent to stand trial,' to viably assist his attorney, and offer a guilty plea in 2008."

18. The DSM–IV is a manual of the standard classifications of mental disorders that mental health professionals use to make a mental health diagnosis. I further note that "severe mental retardation" is the term used in the DSM–IV, the DSM edition used by Dr. Gedo in the Gedo report. However, the fifth edition of the DSM has replaced the term "mental retardation" with "intellectual disability (intellectual developmental disorder)."

Moreover, plea counsel admitted Ramirez appeared to lack a reasonable degree of rational understanding. *See Bouchillon v. Collins*, 907 F.2d 589, 597 (5th Cir.1990) (stating counsel has a duty to investigate his client's mental status when he has reason to believe an investigation is warranted "because, where such a condition exists, the defendant's attorney is the sole hope that it will be brought to the attention of the court"). In contrast to the defendants in *Jeter* and *Lee*,[19] concrete evidence in the record demonstrates plea counsel did not think Ramirez operated as an adult with independent thought processes and functioning. Plea counsel clearly questioned Ramirez's competency and questioned whether Ramirez understood what they were doing in court on the day of his pleas. He saw Ramirez as "very naïve" and as a "child," and admitted it would have been "prudent" to reevaluate Ramirez's competency. Further, plea counsel readily acknowledged he was aware of Ramirez's mental limitations and that after he received the Gedo report, he reviewed the DSM–IV and learned an IQ score of 31 to 44 meant Ramirez was severely mentally retarded. Plea counsel also admitted he reviewed Ramirez's school district report indicating Ramirez "performed better" than only 1% of his peers.

Therefore, I would reverse. *Cf. Carnes v. State*, 275 S.C. 353, 354–55, 271 S.E.2d 121, 121–22 (1980) (reversing the PCR court's grant of PCR based on a finding that the defendant was mentally incompetent to enter a plea of guilty and holding the record reflected the defendant was competent to enter his guilty plea; "We recognize our scope of review in post-conviction issues, however we are controlled here by *State v. Lambert*, 266 S.C. 574, 225 S.E.2d 340 (1976), which holds the test for mental competency to plead guilty is no more stringent than [the] test for competency to stand trial. It is whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." (quotation marks omitted)). Unlike *Carnes*, the *Lambert* test is not met in the case sub judice. The record demonstrates Ramirez did not have sufficient present ability to consult with his lawyer

---

19. *Lee v. State*, 396 S.C. 314, 721 S.E.2d 442 (Ct.App.2011).

with a reasonable degree of rational understanding or a rational and factual understanding of the proceedings against him. Moreover, as the majority noted, Ramirez has received inadequate representation throughout every stage of his legal proceedings. In my view, to affirm the PCR court's decision simply perpetuates the injustice.