**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-7**

BRAD KEITH SIGMON,

             Petitioner - Appellant,

      v.

BRYAN P. STIRLING, Commissioner, South Carolina Department of Corrections
and WILLIE DAVIS, Warden of Kirkland Correctional Institution,

             Respondents - Appellees.

Appeal from the United States District Court for the District of South Carolina, at
Anderson. R. Bryan Harwell, Chief U.S. District Court Judge. (8:13-cv-01399-RBH)

Argued: October 30, 2019                          Decided: April 14, 2020

Before NIEMEYER, KING, and WYNN, Circuit Judges.

Affirmed by published opinion. Judge Wynn wrote the majority opinion, in which Judge
Niemeyer joined. Judge King wrote a dissenting opinion.

**ARGUED:** Joshua Snow Kendrick, KENDRICK & LEONARD, P.C., Greenville, South
Carolina, for Appellant. Melody Jane Brown, OFFICE OF THE ATTORNEY GENERAL
OF SOUTH CAROLINA, Columbia, South Carolina, for Appellees. **ON BRIEF:** Jeffrey
Phillip Bloom, Columbia, South Carolina, for Appellant. Alan Wilson, Attorney General,
Donald J. Zelenka, Deputy Attorney General, OFFICE OF THE ATTORNEY GENERAL
OF SOUTH CAROLINA, Columbia, South Carolina, for Appellees.

WYNN, Circuit Judge:

Petitioner Brad Keith Sigmon seeks habeas relief from his death sentence for the murders of David and Gladys Larke. Sigmon argues that he received ineffective assistance of counsel and that the Supreme Court of South Carolina violated his due process and equal protection rights by granting relief to other similarly situated inmates.

Following a state court's denial of relief, the United States District Court for the District of South Carolina determined that the state court's denial did not constitute an unreasonable application of clearly established federal law or an unreasonable determination of the facts. As to Sigmon's procedurally defaulted claims of ineffective assistance of counsel, the district court concluded Sigmon has not demonstrated cause for the default or actual prejudice.

We affirm.

I.

In 2001, Sigmon and Rebecca Barbare had been in a romantic relationship for approximately three years and lived together in a trailer near the trailer of Barbare's parents, David and Gladys Larke. *Sigmon v. State*, 742 S.E.2d 394, 396 (S.C. 2013). But early in that year, after Barbare ended their relationship and moved in with her parents, Sigmon became increasingly obsessed with Barbare. *Id.*

On April 26, 2001, Sigmon and an acquaintance, Eugene Strube, spent the evening drinking alcohol and smoking crack cocaine. *Id.* Early in the morning of April 27, Sigmon told Strube that when Barbare left to take her children to school the next morning, Sigmon

would go to the Larkes' home, "tie her parents up," and "get ahold of" Barbare. J.A. 40–41.

Later that morning, after Barbare left to take her children to school, Sigmon took a baseball bat from beneath his trailer and entered David and Gladys Larke's home. *Sigmon*, 742 S.E.2d at 396. When David Larke, upon seeing Sigmon, called to Gladys Larke to bring him his gun, Sigmon struck David Larke in the back of his head with the bat several times. *Id.* Thereafter, Sigmon chased Gladys Larke into the living room and struck her several times in the head. *Id.* at 397. Sigmon then went to the kitchen, saw David Larke was still moving, and struck him again. *Id.* And after seeing that Gladys Larke was also still moving, Sigmon struck her several more times. *Id.* David and Gladys Larke died within minutes.

Sigmon retrieved David Larke's gun and waited for Barbare to return. *Id.* When she arrived, Sigmon forced her into her car and drove her away. *Id.* But during the ride, Barbare jumped from the car, causing Sigmon to pull over, chase after her, and shoot her. *Id.* Barbare survived the shooting. *Id.*

Meanwhile, Sigmon fled but was captured in Tennessee ten days later after his mother helped authorities locate him. *Id.* Upon his capture, Sigmon confessed to the murders. *Id.*

A South Carolina grand jury indicted Sigmon, charging him with two counts of murder, first degree burglary, and other offenses, including kidnapping. The state filed notice of its intent to seek the death penalty. Shortly before trial, the state dismissed all charges other than the two counts of murder and the single count of burglary.

3

Attorneys John Abdalla and Frank Eppes represented Sigmon at his July 2002 trial. During the guilt phase, Sigmon admitted his guilt to the jury. *Id*. The state presented evidence that David and Gladys Larke had likely lived for three to five minutes after Sigmon's assault, hemorrhaging and breathing blood, before dying as a result of blunt force trauma to the head. *Id.* The jury found Sigmon guilty of all charges. *Id.*

During sentencing, Sigmon's mitigation case focused on childhood abandonment and the development of his social mores and judgment, as well as evidence of drug use and mental illness. Sigmon also presented evidence he was adapting to prison life and was not a difficult prisoner. Mitigation witnesses included three experts—a clinical social work expert, a pharmacology expert, and an expert on prison adaptability. Sigmon also called five jail employees, five family members, and a volunteer who led a Bible class at the jail. Other witnesses testified about Barbare's previous relationships. After presenting sentencing evidence, the prosecutor and Attorney Eppes each made a closing argument. As permitted by South Carolina law, Sigmon also made a statement to the jury. S.C. Code Ann. § 16-3-28.

The jury recommended a sentence of death after finding three aggravating factors: two or more persons were murdered in one course of conduct; the murder was committed in the commission of a burglary; and the murder was committed in the commission of physical torture. The trial court sentenced Sigmon to thirty years for the burglary charge and to death for the two murder charges. The Supreme Court of South Carolina upheld the sentence on direct appeal. *State v. Sigmon*, 623 S.E.2d 648, 649–50 (S.C. 2005).

4

Sigmon then pursued relief through an application for post-conviction relief ("PCR") filed in state court. The PCR court appointed Attorneys William Ehlies and Teresa Norris to represent Sigmon.

Sigmon alleged in his PCR application that his trial counsel were ineffective in, among other things, failing to object to improper prison conditions evidence, failing to object to improper closing arguments, and making various errors related to the court's instructions on mitigation. An evidentiary hearing was held in August 2008, and in July 2009, the PCR court denied and dismissed Sigmon's PCR application. Sigmon sought review by the Supreme Court of South Carolina, which considered three of Sigmon's claims but ultimately affirmed the PCR court's dismissal. *See Sigmon*, 742 S.E.2d 394.

Thereafter, Sigmon sought relief in federal district court, asserting six grounds for relief, all of which had been presented to the South Carolina courts. After this Circuit's decision in *Juniper v. Davis*, 737 F.3d 288 (4th Cir. 2013), the district court appointed a new attorney—one who had not represented Sigmon before the PCR court—to review the case for claims available under *Martinez v. Ryan*, 566 U.S. 1 (2012). The attorney identified five additional grounds for relief. Sigmon amended his petition to include all eleven grounds. Federal proceedings were stayed while Sigmon pursued a second PCR action in state court, where the state court determined Sigmon's five new claims were procedurally defaulted under South Carolina law. When federal proceedings resumed, the state moved for summary judgment on Sigmon's eleven claims. Sigmon withdrew one defaulted claim before the magistrate judge issued a report and recommendation, leaving four procedurally defaulted *Martinez* claims.

5

Applying the deferential standard of review found in 28 U.S.C. § 2254(d), the magistrate judge recommended denying relief on all six of Sigmon's preserved claims. As for the four *Martinez* claims, the magistrate judge considered affidavits offered by Sigmon in support of these claims and nonetheless concluded none were substantial. Sigmon objected to the magistrate judge's report and recommendation. The district court overruled the objections, finding no preserved claim satisfied the standard articulated in § 2254(d) and no *Martinez* claim was substantial. The district court therefore granted the state's motion for summary judgment.

Thereafter, this Court granted a certificate of appealability on all of Sigmon's preserved claims and all but one of Sigmon's *Martinez* claims. On appeal, Sigmon argues that the district court erred on each asserted ground for relief and seeks to have his sentence vacated or, alternatively, seeks remand for an evidentiary hearing.

II.

We review the district court's denial of habeas relief on summary judgment de novo. *Bostick v. Stevenson*, 589 F.3d 160, 163 (4th Cir. 2009). However, we view this appeal generally through the highly deferential lens mandated by the Antiterrorism and Effective Death Penalty Act, 28 U.S.C. § 2254(d). Our deference under § 2254 ensures "state proceedings are the central process, not just a preliminary step for a later federal habeas proceeding." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). Accordingly, we may grant habeas relief on claims adjudicated on their merits in state court only if the adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"

6

or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Cummings v. Polk*, 475 F.3d 230, 237 (4th Cir. 2007).

On the other hand, this highly deferential standard does not apply to Sigmon's *Martinez* claims, which were not adjudicated on their merits in state court. Generally, a federal court will not review the merits of habeas claims "that a state court declined to hear because the prisoner failed to abide by a state procedural rule." *Martinez*, 566 U.S. at 9. However, under certain circumstances, including raising a claim under *Martinez*, a petitioner may excuse a state court procedural default. *Id.* at 17. In such cases, a federal court considers those claims de novo. *Gray v. Zook*, 806 F.3d 783, 789 (4th Cir. 2015).

## III.

We start with Sigmon's preserved claims. Deference under § 2254 permits habeas relief only if the state court adjudication was contrary to, or involved an unreasonable application of, clearly established federal law or if the decision was based on an unreasonable determination of the facts. A state court adjudication is contrary to clearly established federal law when, on a question of law, the state court "arrives at a conclusion opposite" to a conclusion by the Supreme Court, or when, on "materially indistinguishable facts," a state court decides a case differently than the Supreme Court. *Cummings*, 475 F.3d at 237 (quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000)). And a state court unreasonably applies federal law when it "applies Supreme Court precedent in a different factual context from the one in which the precedent was decided and one to which extension of the legal principle of the precedent is not reasonable [or] fails to apply the

7

principle of a precedent in a context where such failure is unreasonable." *Id.* (alteration in original) (internal quotation marks omitted). In essence, to obtain federal habeas relief, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

Most of Sigmon's arguments allege his trial counsel—Attorneys Eppes and Abdalla—were ineffective. To demonstrate ineffective assistance of counsel, "[a] petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *see also Strickland v. Washington*, 466 U.S. 668, 687 (1984).

A deficient performance is one that falls "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. A petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Id.* at 687. In this analysis, we must resist the temptation to "second-guess counsel's assistance after conviction or adverse sentence" and instead must make "every effort . . . to eliminate the distorting effects of hindsight." *Id.* at 689.

The question of whether counsel's deficiency prejudiced the defense "centers on 'whether there is a reasonable probability that, absent [counsel's] errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Williams v. Ozmint*, 494 F.3d 478, 484 (4th Cir. 2007) (alterations in original) (quoting *Strickland*, 466 U.S. at 695). Such a showing "requires a 'substantial,'

8

not just 'conceivable,' likelihood of a different result." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (quoting *Harrington*, 562 U.S. at 112). In making this determination, we review the "totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695. And where, as here, a claim of ineffective assistance of counsel is advanced on habeas review, the petitioner's bar is even higher: "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Harrington*, 562 U.S. at 105 (citations omitted).

## A.

First, Sigmon claims trial counsel rendered ineffective assistance by failing to object to prison conditions evidence elicited by the state during cross-examination of a defense expert and by failing to object to the state's closing arguments reiterating that evidence. The PCR court concluded that Sigmon failed to satisfy either *Strickland* prong, noting that trial counsel opened the door to the evidence and concluding Sigmon could not show prejudice "given the overwhelming evidence of aggravating circumstances, and the limited mitigation." J.A. 756–57. The Supreme Court of South Carolina declined to review this claim. Because the PCR court's conclusion that Sigmon could not show prejudice is not contrary to clearly established federal law or an unreasonable determination of the facts, we agree that Sigmon is not entitled to relief on this claim.

At trial, Sigmon called James Aiken as an expert witness on prison adaptability and prison conditions. During direct examination, trial counsel asked Aiken, "Tell me a little bit about the way the day is structured in a maximum security facility?" J.A. 359–60. Aiken testified about the constant monitoring, the risk of violence, and the limited rights prisoners

9

are entitled to while incarcerated. On cross-examination, the state asked Aiken about visitation, television, recreation, library access, and showers for prisoners. Trial counsel did not object. During closing arguments, the state argued, "[W]e may think life imprisonment is serious business, but you still have your visitation with your family. You still have your mail. You still have your TV. You still eat three meals a day. Somebody washes and takes care of your clothes. You get all the benefits of health care, and recreation." J.A. 412. Again, trial counsel did not object. Before the PCR court, Sigmon argued trial counsel's failure to object constituted deficient performance because this evidence was inadmissible—and the closing argument improper—under *State v. Plath*, 313 S.E.2d 619 (S.C. 1984).

The PCR court concluded that, at the time of the trial, admission of prison condition evidence was not recognized as reversible error, particularly if the allegedly improper evidence was first elicited by defense counsel. Because trial counsel opened the door to the evidence by calling Aiken and asking him about prison conditions in the first place, "[t]here could be no proper basis for objection," and any failure to object was therefore not deficient performance. J.A. 752. Additionally, the PCR court noted trial counsel's statements in the PCR record demonstrated it was counsel's strategy to offer evidence of prison conditions and show "prison life in harsh reality." *Id.* Finally, the PCR court concluded Sigmon had not shown a reasonable probability that the sentencer would have imposed a different sentence had counsel successfully objected to this evidence.

The record is ambiguous as to whether trial counsel failed to object due to strategy or due to ignorance of the law. In South Carolina capital cases, evidence of prison

10

conditions is inadmissible. *See Bowman v. State*, 809 S.E.2d 232, 241 (S.C. 2018). And even at the time of Sigmon's trial, this rule was clear. *See Plath*, 313 S.E.2d at 627–28. Nonetheless, evidence before the PCR court suggests trial counsel's actions were part of a strategy "to elicit testimony about the harshness of prison life." J.A. 752. However, the record also suggests trial counsel did not know that prison conditions evidence was inadmissible. "[A]cts or omissions made by counsel under a mistaken belief or an ignorance of law are rarely—if ever—'reasonable' in light of prevailing professional norms." *Thompson v. Gansler*, 734 F. App'x 846, 855 (4th Cir. 2018) (unpublished) (collecting cases); *see also Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . ."). Therefore, if trial counsel did not know the evidence was inadmissible, counsel's failure to object cannot be excused as trial strategy.

Nonetheless, even if trial counsel performed deficiently, the PCR court's conclusion that Sigmon cannot show prejudice was neither an unreasonable application of clearly established federal law nor an unreasonable factual determination. There was overwhelming and uncontested evidence of aggravating circumstances, and exclusion of prison conditions evidence would have also excluded parts of Sigmon's mitigation case. And the PCR court was not unreasonable in concluding there was not a reasonable probability that, had counsel objected to this evidence, the sentencer would not have imposed a death sentence. Therefore, Sigmon is not entitled to relief on this claim.

11

B.

Second, Sigmon argues the Supreme Court of South Carolina violated his due process and equal protection rights by denying him certiorari and relief on the issue of prison conditions evidence when "other death-sentenced inmates were granted relief." Appellant's Br. at 27.

In this Circuit, "claims of error occurring in a state post-conviction proceeding cannot serve as a basis for federal *habeas corpus* relief." *Bryant v. Maryland*, 848 F.2d 492, 493 (4th Cir. 1988). Sigmon's claim that the Supreme Court of South Carolina violated his due process and equal protection rights in his post-conviction proceedings is not a cognizable claim, and Sigmon cannot obtain relief. *See, e.g.*, *Lawrence v. Branker*, 517 F.3d 700, 717 (4th Cir. 2008) (concluding petitioner's due process claims arising from state post-conviction proceedings "are not cognizable on federal habeas review").

C.

Third, Sigmon argues trial counsel were ineffective for failing to object to two portions of the prosecutor's closing argument: comments that suggested the prosecutor had already made a reasoned decision that the death penalty was appropriate; and the prosecutor's argument that the jury should send a message to the community. The Supreme Court of South Carolina concluded that trial counsel's failure to object did not constitute deficient performance because the prosecutor's comments were not objectionable. *Sigmon*, 742 S.E.2d at 399–400. On federal habeas review, the district court concluded these comments were "borderline, but not necessarily improper." J.A. 1116. As explained below, under current Fourth Circuit law, the prosecutor's comments about sending a message

12

would be impermissible. However, at the time of Sigmon's trial, these comments were not clearly improper, and trial counsel had a strategic reason for declining to object. Therefore, Sigmon is not entitled to relief on this claim.

During the state's closing arguments, the prosecutor, Robert Ariail, made the following statement: "Now, when we asked for the death penalty, it's a fair and appropriate question for you to say back to me, Solicitor Ariail, why do you think that the death penalty is an appropriate punishment in this case?" J.A. 408–09. He then articulated a justification for the death penalty. Later, he argued that the jury's "decision will ring like a bell in this community as [to] what is the standard for appropriate conduct . . . . [,] and that is what we are asking, is to deter Brad Sigmon and send the message that this type of conduct will not be tolerated in Greenville County, or anywhere in this State." J.A. 415.

On review of the PCR court's decision, the Supreme Court of South Carolina observed, "[T]he solicitor has some leeway in referencing the State's decision to request death, provided he does not go so far as to equate his initial determination with the jury's ultimate task of sentencing the defendant." *Sigmon*, 742 S.E.2d at 400. The court then found the prosecutor "did not equate his role with that of the jury," noting, in the context of the entire closing argument, "the solicitor often emphasized the important role the jury played." *Id*. Because the closing argument was not objectionable, the court concluded trial counsel's failure to object was not deficient performance. *Id*.

The Supreme Court of South Carolina correctly observed that the prosecutor emphasized the role of the jury in his closing argument. And in the context of the prosecutor's closing argument, the comments Sigmon argues suggested the prosecutor had

13

already made a reasoned decision about the death penalty did not misstate the role of the jury. The Supreme Court of South Carolina was not unreasonable in concluding these statements were not objectionable.

As to the prosecutor's comments about sending a message, at the time of Sigmon's trial, South Carolina law suggested the comments were permissible. *See State v. Cain*, 377 S.E.2d 556, 562 (S.C. 1988) ("The 'send a message' argument here certainly did not rise to the level of arousing juror passion or prejudice."). But Sigmon points to *United States v. Runyon*, in which this Court concluded a prosecutor's argument to the jury to "send a message to the community, send a message with your verdict," was improper. 707 F.3d 475, 514–15 (4th Cir. 2013). Under current Fourth Circuit law, the prosecutor's comments about sending a message would be improper. However, *Runyon* was decided more than a decade after Sigmon's trial, so trial counsel's failure to object to a similar argument was not deficient performance under then-applicable precedent.

Moreover, during PCR, trial counsel indicated his strategy was to avoid objecting to the state's closing argument. Specifically, Attorney Eppes testified the prosecutor is "an elected official and jur[ies] tend to think a lot of them. So, unless I caught Solicitor [Ariail] in what I would consider to be a whopper, I can't imagine that I would have objected." J.A. 683. These types of strategic choices are "virtually unchallengeable." *Strickland*, 466 U.S. at 690. Accordingly, the Supreme Court of South Carolina's conclusion that it was not deficient performance to refrain from objecting to these arguments is not contrary to clearly established federal law or an unreasonable determination of facts. Sigmon is therefore not entitled to relief on this claim.

14

D.

Fourth, Sigmon argues trial counsel were ineffective for failing to request a mitigating charge related to intoxication. The PCR court concluded the evidence at trial did not establish Sigmon was intoxicated at the time of the murders. The Supreme Court of South Carolina found the PCR court's conclusion to be sufficiently supported by the record. That conclusion is not an unreasonable determination of the facts in light of the evidence presented, and Sigmon is not entitled to relief on this claim.

During trial, Sigmon offered evidence he consumed alcohol and drugs the night before the crimes. Specifically, Strube, Sigmon's companion that night, testified that Sigmon "drank a six-pack" and that Strube and Sigmon smoked "a couple hundred dollars worth" of crack cocaine. J.A. 52–53. And Charles Hall, who worked for Sigmon, testified that when he saw Sigmon around 8:00 or 8:30 p.m. that night, he "could tell [Sigmon] had been drinking." J.A. 58. Finally, a defense expert testified Sigmon reported in a clinical interview that he had used "about $50 worth" of crack cocaine and had consumed "between two mixed drinks as well as . . . half a bottle of peppermint [Schnapps]." J.A. 326. However, Strube testified that by the time he and Sigmon left Sigmon's trailer, around 8:00 a.m. on the morning of the murders, neither Sigmon nor Strube was under the influence of crack cocaine.

Under South Carolina law at the time of Sigmon's trial, where there is evidence a defendant was intoxicated at the time of a murder, the trial judge must submit to the jury for consideration three mitigating circumstances provided for by state statute. *See State v. Stone*, 567 S.E.2d 244, 248 (S.C. 2002); *see also State v. Evans*, 637 S.E.2d 313, 314–15

15

(S.C. 2006). Specifically, the trial judge must instruct the jury to consider: whether the "murder was committed while the defendant was under the influence of mental or emotional disturbance"; whether the defendant's capacity "to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired"; and "[t]he age or mentality of the defendant at the time of the crime." S.C. Code Ann. § 16-3-20(C)(b)(2), (6)–(7). Here, the trial court instructed the jury on the first two of these statutory mitigating factors—influence of a mental or emotional disturbance and capacity to appreciate the criminality or conform his conduct—but did not instruct the jury to consider the statutory mitigating factor of Sigmon's "age or mentality." The PCR court concluded that this failure was irrelevant because it found that the record did not support an allegation that Sigmon was intoxicated at the time of the murder.

The Supreme Court of South Carolina affirmed the PCR court's dismissal, concluding that "there is evidence of probative value supporting the PCR court's finding that Sigmon was not intoxicated at the time of the murders." *Sigmon*, 742 S.E.2d at 400. Because Strube, who was with Sigmon the night preceding and the morning of the murders, testified Sigmon was not under the influence of crack cocaine just before the murders, the Supreme Court of South Carolina's conclusion is not "an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(2). And the resulting conclusion—that trial counsel did not perform deficiently by failing to request a mitigating circumstance unsupported by the record—similarly survives review under § 2254. Accordingly, Sigmon is not entitled to relief on this claim.

16

E.

Sigmon next argues trial counsel were ineffective for failing to object to the trial court's characterization of non-statutory mitigating circumstances in the jury instructions. Viewing the challenged remarks in the context of the jury instructions as a whole, the Supreme Court of South Carolina concluded the instructions were unobjectionable, and therefore trial counsel were not deficient in failing to object. We agree.

During the jury charge, the trial court instructed the jury to consider mitigating circumstances. Sigmon objects to the trial court's explanation of mitigating circumstances:

> [A] mitigating circumstance is neither a justification or an excuse for the murder. It[ ] simply lessens the degree of one's guilt. That is it makes the defendant less blameworthy, or less culpable. . . . A non-statutory mitigating circumstance is one that is not provided for by statute, but it is one which the defendant claims serves the same purpose.

J.A. 453. Sigmon argues these portions of the trial court's instructions limited the mitigating circumstances the jury was instructed to consider and improperly diminished the role of non-statutory factors.

After the PCR court's dismissal, the Supreme Court of South Carolina reviewed this claim and concluded that in the context of the overall charge, "the court clearly indicated the jury's power to consider any circumstance in mitigation." *Sigmon*, 742 S.E.2d at 402. Moreover, the description of a non-statutory circumstance as "not provided for by statute" "seems to have been added for clarity, not to inject a hierarchy into mitigating circumstances." *Id.* Because the trial court's instructions did not improperly describe non-statutory mitigating circumstances, the Supreme Court of South Carolina concluded trial counsel were not deficient in failing to object. *Id.*

17

It is "well established . . . that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp v. Naughten*, 414 U.S. 141, 146–47 (1973). Here, the trial court explained to the jury that it could choose a sentence of life imprisonment if it found a statutory mitigating circumstance, if it found a non-statutory mitigating circumstance, or as an act of mercy. And the trial court further explained each of those in turn. Therefore, the Supreme Court of South Carolina's conclusion that the instructions, when read in context, were not objectionable is not an unreasonable application of clearly established federal law or an unreasonable determination of the facts. The trial court's instructions correctly explained the jury should consider both statutory and non-statutory mitigating circumstances. Accordingly, Sigmon is not entitled to relief on this claim.

F.

In the last of his preserved claims, Sigmon argues trial counsel rendered ineffective assistance by pursuing an instruction for a mitigating circumstance of provocation by the victim. The PCR court concluded Sigmon had failed to demonstrate deficient performance or prejudice. On habeas review, the district court noted trial counsel's "somewhat confusing deposition testimony" but concluded the PCR court's conclusion that Sigmon had failed to demonstrate prejudice was not an unreasonable application of clearly established federal law or an unreasonable determination of facts. J.A. 1127. We agree.

Trial counsel sought an instruction on the statutory mitigating circumstance of provocation by the victim, which the trial court found supported by "the action of Mr. Larke saying he was going to get his gun." J.A. 399. Sigmon argues "[d]uring closing

18

arguments, however, counsel focused on Sigmon's relationship with Rebecca Barbare as the provocation." Appellant's Br. at 41. Sigmon argues counsel's closing argument sought to blame Barbare—Sigmon describes this as blaming the victim—and risked offending the jury.

On this claim, the PCR court observed the argument "confuses several positions" because it essentially "argues that because counsel failed to specify the supporting facts for the mitigating charge within his closing argument, that the jurors would interpret that as 'blaming the victim,' Ms. Barbare." J.A. 771. Based on its review of trial counsel's description of their strategy, the PCR court concluded the charge and argument were consistent with counsel's strategy and with Sigmon's confessions and statement to the jury. Moreover, the PCR court concluded Sigmon failed to demonstrate prejudice from any error related to this claim "for three reasons: 1) there is a factually distinguishable basis for the charge [in David Larke's action] that is not challenged; 2) the fact of [Sigmon]'s obsessive infatuation with Ms. Barbare was part and parcel of the case . . . ; and 3) the tremendous amount of evidence in aggravation in this brutal double murder." J.A. 773.

As the district court noted, in PCR, trial counsel gave inconsistent testimony on this issue "that could be read to indicate that trial counsel believed the basis for the provocation by victim charge was related to Ms. Barbare's actions with regard to her relationship with" Sigmon. J.A. 1127. However, even if trial counsel misunderstood the basis for the mitigation charge—believing Barbare's actions, rather than David Larke's, provided the basis—Sigmon has not undermined the PCR court's conclusion that he has not demonstrated prejudice.

19

Sigmon's argument focuses on how testimony about Barbare and her previous relationships may have offended the jury. But, as trial counsel testified during PCR, Sigmon and Barbare's relationship was central to counsel's theory of the case. Sigmon does not challenge that strategic choice. Further, Sigmon does not explain how the mitigating charge of provocation by a victim—a charge the trial court concluded was supported by the action of David Larke—caused any alleged offense to the jury. And we will not assume the jury misunderstood the instruction to refer not to provocation by the victim of the charges at trial, but to provocation by the victim's daughter. *See Penry v. Johnson*, 532 U.S. 782, 799 (2001) ("We generally presume that jurors follow their instructions."). The PCR court's conclusion that any deficiency regarding this mitigating charge did not prejudice Sigmon survives review under § 2254. Therefore, Sigmon is not entitled to relief on this claim.

## IV.

We now turn to Sigmon's procedurally defaulted claims, three of which are before us. Generally, if a claim is procedurally defaulted in state court, federal habeas review is barred "unless the prisoner can demonstrate cause for the default and actual prejudice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). And ineffective assistance of state post-conviction counsel generally cannot establish cause for the default because "[t]here is no constitutional right to an attorney in state post-conviction proceedings." *Id.* at 752. However, when state law requires "claims of ineffective assistance of trial counsel [to] be raised in an initial-review collateral proceeding" and not on direct review—which South Carolina law does—procedural default does not bar federal habeas review of "a substantial

20

claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Martinez*, 566 U.S. at 17. Accordingly, to invoke *Martinez* and obtain federal habeas review of a claim defaulted in state court, Sigmon "must demonstrate that state habeas counsel was ineffective or absent, and that the underlying [ineffective assistance of counsel] claim is substantial." *Porter v. Zook*, 898 F.3d 408, 438 (4th Cir. 2018), *cert. denied*, 139 S. Ct. 2012 (2019). To demonstrate that "the underlying ineffective-assistance-of-trial-counsel claim is a substantial one," Sigmon must show "that the claim has some merit." *Martinez*, 566 U.S. at 14.

Sigmon seeks an evidentiary hearing on his *Martinez* claims. We review a district court's decision to deny a habeas petitioner an evidentiary hearing for abuse of discretion. *Conaway v. Polk*, 453 F.3d 567, 582 (4th Cir. 2006). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). And as the Supreme Court recognized in *Martinez*, claims of ineffective assistance of counsel "often depend on evidence outside the trial record." *Martinez*, 566 U.S. at 13; *see also Detrich v. Ryan*, 740 F.3d 1237, 1246 (9th Cir. 2013) (en banc) (plurality opinion). "*Martinez* would be a dead letter if a prisoner's only opportunity to develop the factual record of his state PCR counsel's ineffectiveness had been in state PCR proceedings, where the same ineffective counsel represented him." *Detrich,* 740 F.3d at 1247 (citing *Strickland*, 466 U.S. at 694). Nonetheless, "[w]here documentary evidence provides a

21

sufficient basis to decide a petition, the court is within its discretion to deny a full hearing." *Runningeagle v. Ryan*, 825 F.3d 970, 990 (9th Cir. 2016).

## A.

Sigmon argues trial counsel failed to find and present significant mitigating evidence at the sentencing phase. Sigmon did not present this claim to the PCR court in his first PCR application, so to overcome this procedural default, Sigmon must show PCR counsel were ineffective or absent, and that his underlying claim of ineffective assistance for failure to present additional mitigation evidence is substantial. The district court concluded Sigmon's claim was not substantial and therefore habeas review was barred. We agree.

Trial counsel presented mitigation evidence through three experts, five jail employees, five family members, and a volunteer who led a Bible class at the jail. However, Sigmon alleges trial counsel failed to elicit sufficient mitigating evidence from these witnesses and failed to call additional mitigation witnesses. Specifically, Sigmon argues the following evidence should have also been offered: Sigmon's father, his brother, and Pastor Don McKellar—the pastor at Sigmon's mother and stepfather's church—could have testified about Sigmon's positive adjustment to prison. Barbare's son, who was 12 years old at the time of the trial, could have testified that Sigmon treated him like a son. Sigmon's mother could have testified that Sigmon's father pushed or hit Sigmon during his childhood. She and other family members could have testified that Sigmon began working at age 15 to support his family. Greenville County Detention Center staff psychiatrist Dr.

22

Ernest Martin could have testified about Sigmon's history of depression. And Dr. Martin and Pastor McKellar could have testified to Sigmon's remorse.

Sigmon did not present this claim in his first PCR action, and the state court concluded it was procedurally defaulted. To invoke *Martinez*, Sigmon must demonstrate that this underlying ineffective assistance of counsel claim is substantial with reference to *Strickland*'s two familiar prongs.

Sigmon has not made out a substantial claim that trial counsel performed deficiently. Generally, trial counsel are not required to "investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Wiggins*, 539 U.S. at 533. Rather, trial counsel must "make reasonable investigations or . . . make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.

This case is distinguishable from the cases Sigmon cites. For example, in *Williams v. Taylor*, the Supreme Court held trial counsel were deficient when they failed to seek mitigating prison records and prison-official testimony and when they "failed even to return the phone call of a certified public accountant who had offered to testify" regarding his visits to the defendant "as part of a prison ministry program." 529 U.S. 362, 396 (2000). And in *Gray v. Branker*, despite repeated and serious indications of the defendant's mental impairment, defense counsel never investigated the defendant's mental health after the defendant instructed counsel not to do so on one occasion at the pre-indictment stage. 529 F.3d 220, 229–31 (4th Cir. 2008). This Court held that a "reasonable lawyer" would not rely on such a "self-assessment" by the defendant, and the mental health

23

evidence would have provided the jury a "medical explanation for Gray's compulsive behavior and his inability to control his reactions." *Id.* at 231, 236; *see also Williams v. Stirling*, 914 F.3d 302, 313–15 (4th Cir. 2019) (concluding trial counsel were deficient when they failed to follow up on indications of the defendant's potentially mitigating fetal alcohol syndrome). Similarly, in *Wiggins*, the only significant mitigating factor the defendant's capital jury heard was that the defendant had no prior convictions. 539 U.S. at 537. While defense counsel had indications that the defendant's childhood had been traumatic, defense counsel conducted only a minimal investigation and failed to discover that the defendant experienced severe, long-term physical and sexual abuse, including repeated rape while in foster care. *Id.* at 523–24, 535. The Supreme Court held that such compelling mitigating evidence might have produced a different outcome and that counsel's efforts were prejudicially deficient. *Id.* at 536.

No comparable deficiency occurred here. Much of the evidence Sigmon argues should have been discovered and presented was cumulative of evidence presented to the jury. *See Morva v. Zook*, 821 F.3d 517, 530 (4th Cir. 2016) ("That the mitigating evidence [the defendant] insists should have been presented at trial is merely cumulative to the evidence actually heard by the jury further undercuts [the defendant's] claim for deficient performance."). Several jail employees and an expert testified to Sigmon's adaptability to prison. Positive character evidence came in through a jail volunteer and several family members, including Sigmon's parents and son. A social work expert testified about Sigmon's difficult childhood, including the fact that Sigmon worked as a teenager to support his family. Dr. Martin's diagnosis of major depressive disorder came in through

24

another defense expert. Trial counsel introduced evidence of Sigmon's remorse through Sigmon's mother, through a jail employee, and through their closing argument, which referred to Sigmon's call to his mother before his capture. Sigmon argues no witnesses testified to any physical abuse or domestic violence during his childhood. However, this potentially mitigating fact—in light of the testimony from the social work expert and Sigmon's family about his difficult childhood more generally—is not on a par with the substantial mitigation evidence missed by counsel in *Williams*, *Gray*, and *Wiggins*.

Moreover, Sigmon has not demonstrated how trial counsel's investigation was deficient. Counsel used a mitigation expert, as suggested by the ABA guidelines for death penalty cases. *See American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* 11.4.1(D)(7) (1989). And the mitigation team interviewed several of the people Sigmon now argues should have been asked to testify. *See Rompilla v. Beard*, 545 U.S. 374, 389 (2005) ("Questioning a few more family members and searching for old records can promise less than looking for a needle in a haystack, when a lawyer truly has reason to doubt there is any needle there.").

Affidavits of trial counsel suggest they were not aware of some of the mitigating evidence Sigmon argues should have been presented. However, even if trial counsel did not make reasonable, informed decisions about the scope of the investigation, because the evidence Sigmon identifies is cumulative of evidence presented to the jury, trial counsel's failure to present that evidence did not prejudice Sigmon. *See Morva*, 821 F.3d at 530; *see also Huffington v. Nuth*, 140 F.3d 572, 580 (4th Cir. 1998) ("The Sixth Amendment . . .

25

does not always compel counsel to undertake interviews and meetings with potential witnesses where counsel is familiar with the substance of their testimony.").

Moreover, even assuming Sigmon presents a substantial claim of ineffective assistance of trial counsel, to invoke *Martinez*, he must also demonstrate PCR counsel were ineffective in failing to raise this issue. Sigmon suggests the additional information was "easily located during the *Martinez* review." Appellant's Br. at 52. But PCR counsel's affidavits indicate that although they did not independently interview Sigmon's proposed additional witnesses (other than Dr. Martin) prior to the PCR proceedings, PCR counsel "retained a mitigation investigator who conducted a number of interviews" with family and community witnesses. J.A. 848. Attorney Norris stated that "to [her] knowledge[,] [the] investigator did not interview [Barbare's son] or [Pastor] McKellar." J.A. 849. Nonetheless, Sigmon's allegations of deficient performance are simply that PCR counsel failed to conduct interviews themselves and that their investigator failed to interview Barbare's son and the pastor at Sigmon's parents' church. This is insufficient to show ineffective assistance by PCR counsel, and no other facts alleged in the petition support such a finding.

Sigmon's underlying claim of ineffective assistance of counsel is not substantial and Sigmon fails to show ineffective assistance of PCR counsel, as required under *Martinez*. And the district court did not abuse its discretion by considering the affidavits submitted by Sigmon but not granting him an evidentiary hearing. The facts, as Sigmon alleges them, do not entitle Sigmon to relief.

26

B.

Sigmon next argues trial counsel were ineffective for failing to object to the stun belt he wore during trial. Like the claim relating to mitigation evidence, this claim was procedurally defaulted in state court. The district court concluded Sigmon failed to demonstrate prejudice sufficient to establish a substantial claim under *Martinez*. In light of the limited allegations regarding whether any juror saw the stun belt, we agree that Sigmon has not demonstrated that this claim is substantial.

Once again, to overcome the procedural bar facing claims not adjudicated on the merits by the state court, Sigmon must demonstrate this underlying ineffective assistance of counsel claim is substantial, considering the deficient performance and prejudice requirements of *Strickland*. Here, Sigmon offers affidavits from both trial counsel, each stating that Sigmon

> was required to wear a stun belt in court. This started with the very first hearing in the case. There was never a hearing in court for the judge to decide whether or not Mr. Sigmon would be required to wear a stun belt. We did not consider filing a motion or objecting to Mr. Sigmon wearing a stun belt. I specifically recall that he was wearing a stun belt during jury selection and the voir dire process of jurors. In retrospect, I am concerned that jurors probably saw him with the stun belt. This, coupled with Sigmon's own terrible closing argument, would have been enough to frighten jurors or cause them concern so that it likely influenced their verdict for death.

J.A. 823–24. Attorney Eppes adds, "It never occurred to me to object to Mr. Sigmon being required to wear a stun belt." J.A. 834.

At the time of Sigmon's trial in 2002, it was established that "[w]henever unusual visible security measures in jury cases are to be employed, [courts] require the district judge to state for the record, out of the presence of the jury, the reasons therefor and give counsel

27

an opportunity to comment thereon." *United States v. Samuel*, 431 F.2d 610, 615 (4th Cir. 1970). Three years after Sigmon's trial, in *Deck v. Missouri*, the United States Supreme Court reiterated the "basic principle" that visible restraints like shackling "'should be permitted only where justified by an essential state interest specific to each trial'" and applied the principle to capital sentencing trials. 544 U.S. 622, 628–29 (2005) (quoting *Holbrook v. Flynn*, 475 U.S. 560, 568–69 (1986)). This principle similarly applies to stun belts. *See United States v. Moore*, 651 F.3d 30, 45–48 (D.C. Cir. 2011); *Wrinkles v. Buss*, 537 F.3d 804, 814–15 (7th Cir. 2008); *United States v. Miller*, 531 F.3d 340, 344–45 (6th Cir. 2008); *Gonzalez v. Pliler*, 341 F.3d 897, 899–901 (9th Cir. 2003); *United States v. Durham*, 287 F.3d 1297, 1305–07 (11th Cir. 2002).

The record offers little information about whether the stun belt was visible to the jury. If it was, the longstanding requirement for the trial court to articulate a reason for visible restraints on the record would have applied. *See, e.g.*, *Samuel*, 431 F.2d at 615. There is no such record here, and trial counsel "did not consider filing a motion or objecting" to Sigmon wearing a stun belt for the entirety of the proceedings before the jury. J.A. 823. So, if the stun belt were visible, this would constitute deficient performance. If, on the other hand, the stun belt were not visible, whether trial counsel were deficient for failing to object to a non-visible restraint finds less support in cases decided before Sigmon's trial. *See, e.g.*, *Durham*, 287 F.3d at 1304 ("We have never addressed whether the use of stun belts to restrain criminal defendants raises the same set of constitutional concerns as do other physical restraints."). Although now a trial court must articulate on the record a reason for requiring a defendant to wear a stun belt, it is less clear that counsel's

28

failure to object to a stun belt that was not visible to the jury would have fallen below an objective standard of reasonableness at the time of Sigmon's trial. But even assuming counsel's failure to object was deficient performance, to make out a substantial claim under *Martinez*, Sigmon must also show counsel's error prejudiced him.

Sigmon argues the Supreme Court's decision in *Deck* requires this Court to presume prejudice. *See* 544 U.S. at 635. However, *Deck* was a direct appeal. *Id.* at 625. Here, Sigmon raises a claim of ineffective assistance of counsel. Accordingly, Sigmon must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

To establish prejudice, Sigmon alleges "[t]he likelihood that jurors saw the stun belt means that jurors . . . were fearful of him." J.A. 814. But Sigmon has offered minimal allegations about the stun belt he wore and whether jurors actually saw it. For example, Sigmon does not allege he wore the stun belt over his clothes or that it was visible under his clothing, and he alleges no information about its size other than that it was "large." J.A. 812. As to whether any juror actually saw the stun belt, Sigmon does not allege any juror saw it, and the only evidence offered by Sigmon is trial counsel's affidavits, which state that they are "concerned that jurors probably saw him with the stun belt." J.A. 824, 834.

Where a petitioner presents no evidence a juror saw the stun belt, courts have been reluctant to assume prejudice. *See Miller*, 531 F.3d at 347–48 (collecting cases). At least some courts have considered stun belts to present a lower risk of prejudice than shackles and other methods of restraint because stun belts are worn under clothes and are less obvious to jurors. *See, e.g.*, *Nance v. Warden, Ga. Diagnostic Prison*, 922 F.3d 1298, 1305–

29

06 (11th Cir. 2019) (holding that a state court's conclusion that the petitioner's stun belt was not visible to the jury because it was worn under the petitioner's clothes was not an unreasonable determination of the facts); *Bland v. Hardy*, 672 F.3d 445, 450 (7th Cir. 2012) ("A stun belt may be less prejudicial to a defendant than a courtroom full of armed guards."). But here, Sigmon does not even *allege* a juror saw the stun belt, and we will not assume Sigmon was prejudiced by the stun belt without, at a minimum, an allegation that at least one juror actually saw the stun belt.[*]

Even if Sigmon's ineffective assistance of trial counsel claim were substantial, he must also show PCR counsel were ineffective for failing to raise it. Sigmon offers the affidavit of one PCR counsel, stating she was not aware that Sigmon wore a stun belt at trial, but that if she had been aware of evidence supporting that allegation and the allegation "that jurors who were actually seated likely saw the stun belt," she would have asserted the issue. J.A. 850. This does not demonstrate deficient performance. And although Sigmon alleges that PCR counsel were "unaware of the underlying facts," Sigmon has not argued, except by implication, that PCR counsel performed deficiently in failing to raise this issue. J.A. 814. Because Sigmon's allegations, even if true, do not entitle him to relief, the district court did not abuse its discretion in declining to hold an evidentiary hearing and Sigmon is not entitled to relief on this claim.

---

[*] Courts have considered other ways stun belts may cause prejudice. *E.g.*, *Gonzalez*, 341 F.3d at 900 (considering the "psychological consequences" to a defendant of wearing a stun belt during trial); *Durham*, 287 F.3d at 1306 ("[A] stun belt imposes a substantial burden on the ability of a defendant to participate in his own defense and confer with his attorney during a trial."). But Sigmon has not alleged those other sources of prejudice here.

30

Finally, Sigmon argues that trial counsel were ineffective for not knowing that each defense attorney could present a closing argument at sentencing, allowing one to argue after Sigmon's statement to the jury. The district court observed the record was unclear as to whether trial counsel knew of this option, but nonetheless concluded Sigmon could not show the outcome of the proceeding would have been different had trial counsel addressed the jury one more time. We agree that Sigmon cannot demonstrate prejudice on this underlying claim of ineffective assistance of trial counsel and therefore has not shown this claim is substantial under *Martinez*.

First, it is not clear that trial counsel were unaware of their options regarding the closing argument. During the guilt phase, Attorney Eppes's discussion with the trial court demonstrated he knew counsel's argument could follow Sigmon's and that "the statute did not specify whether the defendant spoke first or second." D. Ct. Dkt. No. 33-1 at 18–19. And the statute Sigmon now cites addresses argument in both the guilt and sentencing phases. S.C. Code Ann. § 16-3-28. However, an affidavit from Attorney Eppes states, "At the time, I believed the law required Mr. Sigmon to be the very last speaker at closing argument at sentencing." J.A. 833. Acts by counsel made "under a mistaken belief or an ignorance of law are rarely" reasonable. *Thompson*, 734 F. App'x at 855.

But second, even assuming that counsel's ignorance of the law regarding the order for closing arguments constitutes deficient performance, Sigmon has not shown "a reasonable probability that, but for counsel's" failure to offer an additional closing argument, "the result of the proceeding would have been different." *See Strickland*, 466

31

U.S. at 694. Attorney Eppes states in an affidavit that if he had known his co-counsel could give a closing argument after Sigmon, he "certainly would have had Mr. Abdalla give a closing argument after Mr. Sigmon." J.A. 833. But even if a second closing argument by counsel had "defused the situation and gotten the jury to re-focus," the jury would have considered the same aggravating and mitigating evidence. *Id.* Here, evidence of aggravating circumstances was uncontested, and Sigmon has not shown a reasonable probability that a second argument by counsel would have resulted in a different outcome.

Moreover, even if Sigmon's ineffective assistance of counsel claim were substantial, he must also show PCR counsel were ineffective for failing to raise it. Sigmon has not argued PCR counsel were ineffective in failing to raise this issue, other than that PCR counsel "would have asserted this issue . . . if counsel had been aware that trial counsel was unfamiliar with the law." J.A. 816. Sigmon is therefore not entitled to relief on this claim.

## V.

Sigmon has failed to show that the state court that denied him post-conviction relief unreasonably applied clearly established federal law or unreasonably determined the facts. He has also failed to demonstrate post-conviction counsel were ineffective in failing to raise any substantial claims. Accordingly, we affirm the district court's denial of habeas relief.

*AFFIRMED*

32

KING, Circuit Judge, dissenting:

Brad Keith Sigmon committed horrific murders. He repeatedly confessed that to police, and he admitted it throughout his trial in the South Carolina state court. Indeed, the only real question for the jury was whether Sigmon deserved the death penalty or a life sentence. In the circumstances, the defense's paramount responsibility was to convince the jury that Sigmon was worthy of some mercy. Yet Sigmon's trial counsel presented a feeble mitigation case, resulting in a significant imbalance between the evidence in aggravation and the evidence in mitigation that has since been repeatedly invoked by the state and federal courts to deny Sigmon relief from his death sentence. Now that the lawyers appointed to represent Sigmon in these federal habeas proceedings have gathered evidence supporting a stronger mitigation case, Sigmon merely asks for a hearing on his claim that his trial counsel's failure to discover and present such evidence amounted to constitutionally ineffective assistance (Ground VII of Sigmon's 28 U.S.C. § 2254 petition). But the district court and my esteemed colleagues in the panel majority have ruled that no hearing is warranted, deeming much of Sigmon's new evidence to be cumulative and his ineffective assistance claim to be facially meritless. Because I disagree and would accord Sigmon a hearing, I respectfully dissent.[1]

---

[1] To be clear, I focus on the ineffective assistance claim raised in Sigmon's § 2254 petition as Ground VII because it is his strongest claim and plainly merits a hearing. I would vacate the judgment and remand for further proceedings that could also include further consideration of Sigmon's other claims, as appropriate.

33

## I.

### A.

In the sentencing phase of Sigmon's July 2002 trial, the prosecution argued that Sigmon deserved no mercy because he showed no mercy to his victims, Gladys and David Larke, "living and breathing human beings who underwent what had to be the most horrific death that [one] could ever imagine, of seeing someone coming at you with a baseball bat." *See* J.A. 413.[2] The prosecution relied on three aggravating factors to obtain a death sentence, needing to prove only one and having already proved the first two in the trial's guilt phase: that Sigmon murdered two or more victims; that he committed the murders in the commission of a burglary; and that he committed the murders in the commission of physical torture.

The defense countered that Sigmon, distraught over his breakup with the Larkes' daughter, Rebecca Barbare, was "a love-sick idiot that snapped" — but he was "not a very bad individual" or "a very bad prisoner." *See* J.A. 416, 427. Among the mitigating factors advanced by the defense were that Sigmon did not have a significant criminal history, that he murdered the Larkes while under the influence of a mental or emotional disturbance, that his capacity to conform his conduct to the requirements of the law was impaired, and that he was adaptable to prison.

---

[2] Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.

1.

The defense presented three expert witnesses in the sentencing phase. Alex Morton, an expert in addictions and psychopharmacology, concluded based on an examination of Sigmon and a review of medical and psychiatric records that Sigmon (1) suffers from "a medical disorder of the brain called recurrent major depressive disorder" (a diagnosis made by a psychiatrist, and not by Morton); (2) has "chemical dependency disorders, specifically regarding cocaine, alcohol and marijuana, and some past use of other substances"; and (3) "was using a number of substances to treat his depression and temporarily was probably helping . . . but overall made that depression worse." *See* J.A. 320-21. Morton also testified that Sigmon's use of alcohol and crack cocaine prior to the murders could have caused him to be violent, agitated, and impulsive. Regarding the evidence that Sigmon repeatedly struck the Larkes with a baseball bat, Morton explained that "repetitive behaviors" are consistent with cocaine use, and that "it's almost like once [Sigmon] started, he did not stop, and that is something you see with animals that are being studied with cocaine." *Id.* at 345-46.

Shirley Furtick, a licensed clinical social worker employed by the South Carolina Department of Mental Health, conducted a biopsychosocial assessment that included interviews with Sigmon, his parents, and other family members, along with a review of Sigmon's available medical and law enforcement records. *See* J.A. 199-200 (Furtick's testimony that a biopsychosocial assessment is used to "explore histories of persons" and "explain how they came to be who they are"). Recounting significant aspects of Sigmon's childhood, Furtick noted that Sigmon was the oldest of five children, born in quick

35

succession when their mother was between the ages of just seventeen and twenty-two; that Sigmon's father was in the military, causing the family to relocate frequently, including to the Philippines soon after the fifth child was born; that Sigmon's mother had difficulty coping with being a young mother and adjusting to military life; that Sigmon's father abused alcohol and spent a lot of time away from the family; that Sigmon's parents intermittently separated, eventually divorced, and both remarried, with Sigmon being moved back and forth between the parents and various stepparents; that Sigmon lived in ten different states by the time he was sixteen years old; and that he dropped out of high school at nineteen to get married, nine weeks before graduation. Furtick also mentioned that Sigmon "was not only what we call a surrogate parent or caretaker for his younger siblings, but he was also a provider for the family in helping the mother to financially provide for the children. He went to work at age 16 while also trying to attend school." *Id.* at 218.

According to Furtick, although Sigmon's "basic human needs" for food, shelter, clothing, and education were met as a child, his family's frequent moves were "very disruptive" and "a problem area for [Sigmon]." *See* J.A. 227. Additionally, Sigmon was a victim of "emotional neglect," in that his mother, as a result "of her responsibilities for all of these kids, could not have been consistently emotionally available to all of these kids at the same time." *Id.* Furtick explained that children like Sigmon often "end up feeling depression" and "develop anxious habits," causing them to be unable to "establish and maintain healthy relationships" and to "tend to be over reactive and overly involved or attached to relationships." *Id.* Furtick also related that, as an adult, Sigmon "saw his role

36

as provider and caretaker"; when he was in a relationship and his partner "would start to reject him, he couldn't understand that, and he would get depressed and he would self-medicate his depression with his alcohol [and drugs]." *Id.* at 239. In Furtick's view, Sigmon's mental state and substance abuse impaired "his ability to use good judgment and insight," with "[v]ery poor" results. *Id.* at 242.

James Aiken, an expert in prison adaptability, assessed Sigmon and determined "that he can be incarcerated in a prison setting for the remainder of his life without causing an undue risk of harm to staff, inmates, as well as to the general community." *See* J.A. 362. Aiken based his assessment on, inter alia, evidence that Sigmon "adjusted very well to his confinement" during his pretrial detention and that he was not a member of a gang or other security threat group. *Id.* at 363-64.

2.

The defense called five of Sigmon's family members to testify on his behalf. Sigmon's aunt, Brenda Clark, testified that Sigmon had been "a happy little baby" and "just seemed like a normal child that did normal childhood things." *See* J.A. 279. As an adult, Sigmon "loved to be around the family" at Christmas get-togethers, where he would "hug [Clark] and say, I love you, Aunt Brenda." *Id.* at 280. Clark said she could feel that Sigmon was sincere and knew him to be a loving and caring person.

Sigmon's stepfather, Donnie Wooten, testified that Sigmon "was just like a normal kid" who did "[n]ot really" need discipline, answered "yes, sir," and did what he was told. *See* J.A. 156. Wooten said that Sigmon "seemed fine" as an adult; treated his mother "nice, good"; treated Wooten "[f]ine, good, real good"; treated the remainder of the family

37

"[n]ice"; and generally "treats everybody fine, you know, decent." *Id.* at 157. Wooten also testified that he knew the Larke family and they were "[r]eal nice people." *Id.*

Sigmon's adult son, Robbie Sigmon, testified that Sigmon never abused him and was "a loving father." *See* J.A. 161. Robbie recalled "the happiest birthday [he] ever had," when his father "bought [him] a dirt bike" rather than "getting insurance." *Id.* Robbie also recalled frequently playing outside with his father and helping him at work.

Sigmon's father, Ronnie Sigmon, testified that he "was very proud of [Sigmon], still am," though Sigmon had "made a mistake of course." *See* J.A. 381. Ronnie said that "what's so shocking about [the murders]" was that Sigmon "was always the peace maker" and "the one that stopped the fights." *Id.* (elaborating that he "used to think [Sigmon] might be a coward, but he just didn't want the trouble"). Ronnie praised his son as a talented hunter, fisherman, and athlete who was "tremendously good in soccer" but whose potential sports career was hindered by the family's frequent moves. *Id.* Turning back to the murders, Ronnie said that he felt "as bad for the Larke family as [Sigmon did]," that such conduct had "never been in our family on either side," and that "[s]omething pushed [Sigmon's] buttons." *Id.* at 382.

The final family member to testify was Sigmon's mother, Virginia Wooten, who described learning about the murders and then urging Sigmon to surrender to the police. Virginia recounted that Sigmon immediately expressed remorse, saying "he didn't want to live" and had "done an awful thing." *See* J.A. 389. According to Virginia, both she and Sigmon would have given their lives in order to "bring [Gladys and David Larke] back." *Id.* at 391-92.

38

3.

The defense's mitigation case also involved six witnesses who had interacted with Sigmon during his pretrial detention at the Greenville County Detention Center. Rosa Jones, a licensed practical nurse on staff, recalled that she spoke with Sigmon upon his arrival at the jail in May 2001. Jones said Sigmon "was sad, and he acted sort of remorseful." *See* J.A. 187.

Julia Moore, a licensed professional counselor who worked with jail inmates, testified that she spoke with Sigmon three times — first when he arrived at the jail in May 2001 and then in September 2001 and February 2002 to check medication prescribed by the jail psychiatrist. Each meeting lasted for approximately five to ten minutes and led Moore to conclude that Sigmon was not exhibiting any suicidal or homicidal ideations. *See, e.g.*, J.A. 180 (Moore's testimony regarding the jail intake meeting that "[a]t that point he seemed not to be any danger to himself or anyone else").

Correctional officer Valerie Putnam testified that she had interacted with Sigmon at the jail "[e]very now and then" and he had never posed a threat to her or anyone. *See* J.A. 264-65. Their conversations had been "short and brief," and he was always "pleasant" to be around. *Id.*

Officer Matt Talley testified that Sigmon was "just like any other inmate, as far as [Talley had] never had any problems with him personally." *See* J.A. 175. When asked by defense counsel to comment on Sigmon's "aggressive or violent nature," however, Talley recalled that Sigmon once became aggressive "with another younger officer," prompting

Talley to "step[] in at that time and calm[] the situation down." *Id.* Otherwise, Talley had "never heard [Sigmon] threaten anybody." *Id.*

Captain Michelle Melton, who oversaw the jail, testified that Sigmon was initially housed in a maximum-security unit because of the severity of the charges against him, but was soon moved to a medium-security unit because of his good behavior. Thereafter, officers found a jail visitation pass — a contraband item that could be used to facilitate an escape — hidden in Sigmon's cell. When Melton confronted Sigmon about the pass, he admitted that he had been "trying to find a way to get out of here," but opted not to use the pass to escape and concealed it in his cell for lack of a way to dispose of it. *See* J.A. 290-91. As punishment, Sigmon was temporarily returned to the maximum-security unit, where he staged a brief hunger strike in protest. Since then, Melton testified, there had been "no significant behavioral problems from [Sigmon]." *Id.* at 300. Melton described Sigmon as "well mannered, respectful, well presented in his communication skills and his appearance, actively involved in religious activities. He goes about business . . . in an institution as expected." *Id.* at 304.

Finally, Terry Bradley, who led a weekly Bible class at the jail, testified that Sigmon was "very faithful in coming [to the class]" and "showed enthusiasm to simply learn more about God." *See* J.A. 268. Bradley recounted that Sigmon once brought to class a Muslim fellow inmate who subsequently converted to Christianity. Bradley said Sigmon "seemed to be a normal average person" and did "not really" "seem any different than the other guys who had lesser crimes." *Id.* at 276.

B.

Reflective of the weakness of the mitigation evidence presented by Sigmon's trial counsel, it took the jury less than three hours to return its unanimous recommendation that Sigmon be sentenced to death. Since then, courts have repeatedly cited the defense's meager mitigation case in concluding that Sigmon was not and could not have been prejudiced by other errors in his trial. For example, in rejecting the ineffective assistance claim raised in Sigmon's application for post-conviction relief ("PCR") on the ground that his trial counsel should have objected to prison conditions evidence elicited by the prosecution, the state PCR court ruled that Sigmon suffered no prejudice "given the overwhelming evidence of aggravating circumstances[] and the limited mitigation." *See Sigmon v. State*, No. 2006-CP-23-6547, at 30-31 (S.C. Ct. Com. Pl. July 20, 2009). Today, our panel majority defers to the PCR court's prejudice ruling to reject the same claim (Ground I of Sigmon's 28 U.S.C. § 2254 petition).

C.

As the lawyers appointed to represent Sigmon in these federal habeas proceedings have shown by way of affidavits, however, there was a stronger mitigation case to be made. These affidavits reflect that, because of an inadequate investigation by Sigmon's trial counsel, there were witnesses who took the stand without imparting important information, as well as other potentially helpful witnesses who were never called. Based on the affidavits, Sigmon simply requests "an evidentiary hearing to further develop the mitigation case that should have been presented on [his] behalf," in an endeavor to prove

41

the ineffective assistance claim raised in his § 2254 petition as Ground VII. *See* Br. of Appellant 59.

Perhaps most importantly, the affidavit of Sigmon's mother, Virginia Wooten, reveals she and Sigmon were both victims of repeated physical abuse by Sigmon's father, Ronnie Sigmon. In Virginia's account, during her marriage to Ronnie, he would "often get physical and violent with [her]," while Ronnie was both intoxicated and sober. *See* J.A. 862. Although "Ronnie did not normally beat [his] children," he abused Sigmon because Sigmon, as the eldest child, made efforts to protect Virginia. *Id.* Sigmon's efforts began around age six, when he "would say things like, 'Don't hit my mama.'" *Id.* At about ten or twelve years old, Sigmon "would physically get between [Virginia and Ronnie] and try to grab Ronnie's hands. Ronnie would knock him out of the way or shove him or slap him. This happened a lot." *Id.* During an argument between Virginia and Ronnie that occurred when Sigmon was approximately fifteen years old, "Ronnie hit [Virginia] multiple times in the face," causing Virginia's glasses to scratch her face and leave marks. *Id.* In response, Sigmon "tried to intervene to protect [Virginia,] and Ronnie punched [Sigmon] and knocked him down." *Id.* According to Virginia, there were "many other incidents . . . where Ronnie hit or punched [Sigmon] when [Sigmon] was trying to protect [Virginia] from Ronnie during a physical and violent fight." *Id.*

The various affidavits also provide the following additional information relevant to Sigmon's mitigation case:

- Dr. Ernest Martin, the staff psychiatrist at the Greenville County Detention Center, would have provided a "general summary" of his ongoing treatment of Sigmon, including that Martin diagnosed

42

Sigmon with "Major Depression" ("a major mental illness"), prescribed him various medications, and "found no evidence that [Sigmon] was malingering in any way whatsoever." Martin also would have given more detailed testimony as to relevant "opinions, impressions, diagnoses, notes, [and] reports," *see* J.A. 840-44;

● Sigmon's brother, Mike Sigmon, would have testified that, "[d]uring the time just before the [murders, Sigmon and Rebecca Barbare] were having problems," and Sigmon "was very upset and was abusing alcohol and illegal drugs." Nevertheless, Mike "was shocked when [he] learned of the [murders]," as "[i]t was completely out of character for [his] brother . . . to have done [those] horrible crime[s]" and Sigmon "had never borne any ill will or bad feelings toward the Larkes," *id.* at 855;

● Mike Sigmon, Virginia Wooten, and Virginia's brother Louis Burrell each would have explained that, when Sigmon was about fifteen years old and his father was withholding money from the family while stationed overseas, Sigmon chose to both attend school and work the night shift (approximately forty hours per week) at a local mill to support mother Virginia and his siblings, *id.* at 828, 854, 861;

● Rebecca Barbare's son and the Larkes' grandson, Troy Barbare, Jr., would have testified that, when his mother and Sigmon were dating, Sigmon treated Troy "like a son" and "was more of a father to [Troy] than [Troy's] own biological father," *id.* at 826;

● Don McKellar, the pastor of the church attended by Sigmon's mother and stepfather, would have testified — despite his friendship with the Larkes' son, Pastor Darrell Larke — that he visited Sigmon at the jail and Sigmon expressed genuine remorse about the murders, *id.* at 846 (recounting that Sigmon "was very remorseful. He was very sorry for the harm that he had caused to the Larke family, and to his own family. [Sigmon] was very sincere in his remorse");

● Pastor McKellar also would have testified that he had experience working with "thousands of inmates," that he possessed "good insight into the type of character that makes inmates act positively during their incarceration," and that he expected "Sigmon would have been one of the good and well-behaved inmates and . . . would try to help others in prison," *id.*; and

- Sigmon's father, Ronnie Sigmon, similarly would have testified that, based on his more than five years of experience as a correctional officer with the South Carolina Department of Corrections (from 1995 through 2000), he was confident that Sigmon would "adjust[] positively to prison," "would obey correctional officers and staff," and "would not be a future danger or threat," *id.* at 859-60.

## II.

Again, with respect to Sigmon's claim that his trial counsel's failure to discover and present stronger mitigation evidence amounted to constitutionally ineffective assistance, the sole question before us is whether that claim merely warrants a hearing. Under the applicable standard of *Martinez v. Ryan*, 566 U.S. 1 (2012), the panel majority agrees with the district court that the answer is "no." *See Martinez*, 566 U.S. at 14 (concluding that where, as here, a state post-conviction proceeding was the first and a missed opportunity to raise a claim of ineffective assistance of trial counsel, a prisoner may establish cause for the default by showing that counsel in the state post-conviction proceeding was constitutionally ineffective and "that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one"). The majority specifies that the documentary evidence provides a sufficient basis to decide that Sigmon cannot satisfy the *Martinez* standard and, thus, "the district court did not abuse its discretion by considering the affidavits submitted by Sigmon but not granting him an evidentiary hearing." *See ante* 26.

As the majority sees it, Sigmon's claim of ineffective assistance of trial counsel is "not substantial." *See ante* 22. That is, the majority concludes that the claim does not qualify as "substantial" under *Martinez*, which defines a substantial claim as one that "has some merit." *See Martinez*, 566 U.S. at 14. Rather, the majority rates Sigmon's claim

44

"insubstantial," meaning that "it does not have any merit or that it is wholly without factual support." *See id.* at 16.

The majority reasons that, because "[m]uch of the evidence Sigmon argues should have been discovered and presented was cumulative of evidence presented to the jury," Sigmon cannot prove either deficient performance or prejudice under the familiar standard of *Strickland v. Washington*, 466 U.S. 668 (1984). *See ante* 24-26. In deeming the new evidence to be "cumulative," the majority describes the trial evidence thusly:

> Several jail employees and an expert testified to Sigmon's adaptability to prison. Positive character evidence came in through a jail volunteer and several family members, including Sigmon's parents and son. A social work expert testified about Sigmon's difficult childhood, including the fact that Sigmon worked as a teenager to support his family. Dr. Martin's diagnosis of major depressive disorder came in through another defense expert. Trial counsel introduced evidence of Sigmon's remorse through Sigmon's mother, through a jail employee, and through their closing argument, which referred to Sigmon's call to his mother before his capture.

*Id.* at 24-25. As for the revelation that Sigmon and his mother were subjected to repeated physical abuse by Sigmon's father, the majority summarily dismisses that evidence as "not on a par with the substantial mitigation evidence missed by counsel" in cases in which ineffective assistance has been found, including *Williams v. Taylor*, 529 U.S. 368 (2000), and *Wiggins v. Smith*, 539 U.S. 510 (2003). *See ante* 25.

I cannot agree with the majority that the evidence proffered by Sigmon in these federal habeas proceedings is largely cumulative of the trial evidence. Simply put, the new evidence is markedly more compelling, detailed, and favorable to Sigmon than that presented at trial.

45

For example, Sigmon's family pastor and father — both with ample personal knowledge of Sigmon and extensive experience with inmates — have now attested that Sigmon would remain a "good and well-behaved inmate[]" and "would not be a future danger or threat." *See* J.A. 846, 859-60. That evidence is not cumulative of the trial testimony of a few jail employees, based on limited interactions with Sigmon during his pretrial detention, that they had "never heard [Sigmon] threaten anybody" and that he was generally "pleasant" and "respectful." *See id.* at 175, 264, 304. Nor is it cumulative of the prison adaptability expert's opinion, based on Sigmon's stint in pretrial detention and his lack of membership in a gang, that Sigmon "can be incarcerated in a prison setting for the remainder of his life without causing an undue risk of harm." *See id.* at 362.

The positive character evidence offered by the murder victims' grandson that Sigmon "was more of a father to [him] than [his] own biological father," is not cumulative of the generic testimony of Sigmon's family members and the jail volunteer that, inter alia, Sigmon "loved to be around the family," "treat[ed] everybody fine," bought his son a dirt bike and played with him outside, "was always the peace maker," and was "very faithful in coming [to the jail Bible class]." *See* J.A. 157, 161, 268, 280, 381, 826. Furthermore, the full description of Sigmon choosing, as a teenager, to both attend school and work a forty-hour-per-week night shift at a local mill to financially support his mother and siblings, is not cumulative of the bare mention at trial by the clinical social worker that Sigmon "help[ed] [his] mother to financially provide for the children" by going "to work at age 16 while also trying to attend school." *See id.* at 218, 828, 854, 861. Similarly, the plethora of evidence available through Sigmon's treating psychiatrist as to Sigmon's

46

ongoing battle with major depression, is not cumulative of the addiction expert's testimony that a psychiatrist had made that diagnosis. *See id.* at 320, 840-44. And finally, the account of Sigmon's remorse from his family pastor, shared by the pastor despite his friendship with the murder victims' son, is not cumulative of testimony from Sigmon's own mother that Sigmon was sorry for his crimes. *See id.* at 389, 846. Nor is the pastor's account of Sigmon's profound remorse cumulative of the testimony of the jail nurse that, upon arriving at the jail, Sigmon "acted sort of remorseful." *See id.* at 187.

I also cannot agree with the majority that the new evidence that Sigmon and his mother were physically abused by Sigmon's father is too insignificant to possibly merit habeas relief. Such abuse constitutes "the kind of troubled history [the Supreme Court has] declared relevant to assessing a defendant's moral culpability." *See Wiggins*, 539 U.S. at 535. Moreover, the Court has instructed that an ineffective assistance claim like Sigmon's requires an individualized assessment, in which we must "evaluate the totality of the available mitigation evidence . . . in reweighing it against the evidence in aggravation." *See Williams*, 529 U.S. at 397-98. Here, there is likely more to be divulged about the extent and the effect of the physical abuse that Sigmon witnessed and endured before a proper individualized assessment can occur.

In these circumstances, the answer to the question of whether a hearing on Sigmon's ineffective assistance claim is warranted should be an emphatic "yes." Contrary to the panel majority, Sigmon's new evidence is not cumulative of the trial evidence and otherwise insufficient to potentially entitle him to relief habeas relief, and thus the

47

ineffective assistance claim is not facially insubstantial nor is it otherwise deficient under

*Martinez.*[3]  Accordingly, I dissent.

---

[3] Notably, the majority ventures beyond the district court's decision and concludes that, in addition to being facially insubstantial, Sigmon's claim of ineffective assistance of trial counsel is deficient under *Martinez* because Sigmon has failed to "demonstrate PCR counsel were [constitutionally] ineffective in failing to raise this [claim]." *See ante* 26. The issue of PCR counsel's ineffectiveness, however, is one that should be developed in a hearing and not decided by this Court in the first instance.